Building Owners and Managers Association, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Southeastern Pennsylvania Transportation Authority, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 7, 1983, before President Judge CRUMLISH, JR., and Judges ROGERS, BLATT, WILLIAMS, JR., and DOYLE.

*Louis J. Carter,* for petitioner, Building Owners and Managers Association.

*Roslyn G. Pollack*, with her *Alan M. Lerner, Cohen, Shapiro, Polisher, Shiekman and Cohen;* of counsel, *Robert C. West, G. Roger Bowers and Vincent J. Walsh,* for petitioner, Southeastern Pennsylvania Transportation Authority.

*Marlane E. Chestnut,* Assistant Counsel, with her *Steven A. McClaren,* Assistant Counsel, *Albert W. Johnson, III,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Irwin A. Popowsky,* Assistant Consumer Advocate, *David Wersan,* Assistant Consumer Advocate and *Walter W. Cohen,* Consumer Advocate, for intervenor, Walter W. Cohen, Consumer Advocate.

*David B. MacGregor,* with him *Robert H. Young and Walter R. Hall, II, Morgan, Lewis & Bockius;* of counsel, *Edward G. Bauer, Jr.,* Vice President and General Counsel, and *Irene A. McKenna,* Assistant Counsel, for intervenor, Philadelphia Electric Company.

*David M. Kleppinger,* with him *Edward J. Riehl, McNees, Wallace & Nurick,* for intervenor, Philadelphia Area Industrial Energy Users Group.

*Charles J. Streiff,* with him *Henry M. Wick, Jr., Wick, Rich, Fluke & Streiff, and Wayne L. Emery and Kenneth R. Pepperney,* for intervenor, United States Steel Corporation.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., January 18, 1984:

We have consolidated for argument and disposition the appeals of Building Owners and Managers Association and Southeastern Pennsylvania Trans-

portation Autority (SEPTA) from an order of the Pennsylvania Public Utility Commission.[1] We affirm.

On July 29, 1981, the Philadelphia Electric Company (PECO) filed Supplement No. 28 to its Tariff Electric-Pa. P.U.C. No. 25 with a proposed effective date of September 27, 1981. This supplement was designed to produce an annual base rate increase of approximately $344.5 million. By order dated September 16, 1981, the Commission initiated a formal rate investigation and allowed the Supplement to be suspended by operation of law for seven months under Section 1308 of the Public Utility Code, 66 Pa. C. S. §1308.

Hearings were held before an Administrative Law Judge who, on April 8, 1982, issued a Recommended Decision. The Commission entered its Final Opinion and Order on May 21, 1982, which adopted the ALJ's Recommended Decision on the rate structure matters at issue in the appeals *sub judice.*

### No. 1445 C.D. 1982

SEPTA presents two arguments on appeal. It contends first that it is entitled to a separate mass transportation rate which is designed to return to PECO a rate of return equal to its system rate of return. SEPTA also contends that it is entitled to the extension of conjunctive billing to its Reading Commuter Lines.

In support of its argument for a separate mass transportation rate, SEPTA points to its unique service characteristics.[2] The Commission, in adopting

---

[1] Entered on May 21, 1982 at Docket No. R-811626.

[2] SEPTA argues that its peak usually falls on a winter morning as compared to the remainder of the HT (High Tension) class, its traction power is received at 30 points, and it serves total public interest.

the ALJ's decision, rejected SEPTA's claim for a separate rate. The ALJ noted that SEPTA attempted to show itts uniqueness without examining òther High Tension (HT) customers. The ALJ further noted that the mere fact SEPTA may contribute a rate of return greater than the system average does not mean it deserves a special rate. We agree.[3] We rejected a similar argument in *United States Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978). There, U.S. Steel requested a separate rate, presenting two substantial factors demonstrating its uniqueness: (1) its average gas usage was more than eighty-seven times higher and thirty times higher than the average usage of the two rate classes with which it was to be combined, and (2) it received gas service directly from the gas transmission pipeline. What we stated in *U.S. Steel* is equally applicable to the case before us. A large volume of use does not entitle a customer to a preferred rate. Questions concerning the reasonableness of rates and the difference between rates are factual questions for the Commission, whose findings must be upheld if supported by competent evidence. *U.S. Steel* at 211, 290 A.2d at 857. Moreover, the mere fact that SEPTA may contribute a rate of return greater than the class average does not mean that it deserves a special rate. *See, e.g., Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa.

---

[3] SEPTA relies on *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958). There, the court directed the Commission to establish a separate rate for a group of customers. The Commission order which was overturned had imposed upon complaining customers of a water company the cost of a loss of water supply as the result of leaks in the utility's general distribution system which was not connected with the water main exclusively serving the complaining customers.

Commonwealth Ct. 285, 291, 433 A.2d 610, 614 (1981). Testimony before the ALJ showed that Rate HT is designed to accommodate a wide range of demand and usage characteristics, and that all HT customers benefit from this diversity. Accordingly, we are satisfied that there is competent evidence to support the Commission's finding.

SEPTA also argues that it is entitled to conjunctive billing of its Wayne Junction Substation. This claim arises from its acquisition in 1979 of Reading Commuter Lines which is supplied by the Wayne Junction Substation. All twenty-nine of SEPTA's other feeder points are billed conjunctively.

Section 2.2 of PECO's tariff states the general rule of conjunctive billing:

> *Single Point Delivery:* Unless otherwise stipulated therein, the rates in this Tariff for each class of service are based upon its supply through a single delivery and metering point for the total requirements at each separate premises of contracting Customer. Separate supply for the same Customer at other points of consumption shall be separately metered and billed.

An exception found in the Rate HT Tariff provides:

> Where a load of an industrial Customer located on single or continuous premises becomes greater than the capacity of the standard circuit or circuits established by the Company to supply the Customer, an additional separate delivery point may be established for such premises upon the written request of the customer and billing continued as if the service were being delivered and metered at a single point, provided such multi-point delivery is not disadvantageous to the Company.

The ALJ's opinion as adopted by the Commission noted that the purpose of the limited conjunctive billing exception is to handle service growth by an individual customer, not service acquisitions. The ALJ reasoned that there is no reason why SEPTA should receive the benefit of reduced demand charges when all of the costs of dual services and meter reading are present. We agree. On its face, the billing exception in the tariff requires both that a customer's load exceeds the capacity of the existing circuits and that the contiguous billing would not be disadvantageous to the utility. The ALJ properly found that SEPTA met neither of these requirements as specified in PECO's tariff.

### No. 1424 C.D. 1982

The Association alleges unlawful discrimination in PECO's rate structure, arguing that its members[4] have been assigned a far greater revenue responsibility than is justified. Specifically, it alleges that there is intradiscrimination within the Rate HT class, that the Commission erred in retaining the 80% demand rachet, and that there is insufficient evidence to support the adoption of the revenue-neutral time-of-use energy surcharge and credit rates. The Association bases its complaint on Section 1304 of the Public Utility Code, 66 Pa. C. S. §1304, which provides in pertinent part:

> No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public util-

---

[4] The Association's members consist of large office building owners.

ity shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service. . . . This section does not prohibit the establishment of reasonable zone or group systems, or classifications of rates . . . .

Before addressing the individual arguments of the Association, we reiterate that mere variation in rates among classes of customers does not violate the Public Utility Code. The requirement is merely that rates of one class of service shall not be unreasonably prejudicial and disadvantageous to a patron in any other class of service. Thus, for a rate to be found unlawfully preferential, there must be both an advantage to one and a resulting injury to another. *Manufacturer's Association of Erie v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 31, 34, 407 A.2d 114, 116 (1979).

The Association argues that there is unlawful discrimination within the Rate HT class which is caused by the increase by 72.3% in the demand block and increases in the energy block declining from 12.3% in the initial block to 3.4% in the tail block. The Association argues that discrimination could be avoided merely by equalizing the rate increases of the demand and energy charges. The ALJ's opinion as adopted by the Commission held that the design of Rate HT is basically the rate design which the Commission ordered in R.I.D. 438, and it is the rate design which most precisely tracks the costs imposed by Rate HT customers.[5] When R.I.D. 438 was appealed to this Court in *Park Towne v. Pennsylvania Public Utility*

[5] We reject the Association's contention that the Commission rejected in R.I.D. 439 the same rate design at issue here. PECO's Rate HT design satisfies the Commission's concern in R.I.D. 438 that demand and load factor variations among customers would re-

*Commission,* 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981), we rejected an identical argument of Park Towne. There, Park Towne insisted the proposed rate design actually increased the inequity between mid-demand and high-demand users. All that Park Towne proved then and all that the Association has proved now is that some other users in different demand classes pay lower rates than themselves. "We have repeatedly held that such differences do not establish the existence of unreasonable or discriminatory rates." *Park Towne* at 291, 433 A.2d at 614.

The Association's second argument is that the Commission erred in retaining the 80% demand rachet.[6] We disagree. The ALJ noted that the purpose of this rachet is to provide an incentive to control summer demand. Moreover, the record supports the ALJ's finding that PECO's cost of providing service is highest in the summer, that the demand rachet is PECO's principal mechanism to encourage HT customers to reduce summer demand, and that reductions in summer demand produce lower rates for all customers. Therefore, we hold that the retention of the rachet is supported by substantial evidence and not in error of law.[7]

---

sult in varying amounts of customer costs being collected by the company. Further, there is no deficiency created through inadequate rates as there was in R.I.D. 438.

[6] This mechanism charges Rate HT and Rate PD customers whose demand in any of the eight winter months is less than 80% of their highest monthly demand in any of the previous summer months as if they are demanding 80% of their summer demand.

[7] The Association also argues that the burden was on the utility to support the rachet. We disagree. The demand rachet was an existing rate, previously approved by the Commission. The burden, therefore, falls on the customer to prove that the rate is no longer reasonable. *Brockway Glass Co. v. Pennsylvania Public Utility Commission,* 63 Pa. Commonwealth Ct. 238, 243, 437 A.2d 1067, 1070 (1981).

The Association's last argument is that there is insufficient evidence to support the adoption of revenue-neutral time-of-use energy surcharge and credit rates. As originally proposed, an energy surcharge was to be imposed on customers for usage during peak hours, and a credit was to be allowed for usage which falls outside that period. During the proceeding, however, the proposal was modified to make the time-of-use adjustment revenue neutral on customers below 2000 kw. The Association complains that the effect of the modification is to shift the burden from heavy industrialists, who are net-credit customers, to the Association's members, who are net-surcharge customers.

We hold, however, that there is competent evidence to support the modification of the surcharge and credit mechanism. The ALJ wrote, in accepting the modification and rejecting the Association's complaint:

> PECO claims that since the existing usage patterns of their customers are more off-peak than on-peak, introduction of this cost-based time-of-use rate will result in an initial revenue loss of $1.86 million . . . .

> [The Office of Consumer Advocate (OCA)] contested the reasonableness of PECO's revenue loss projections under the proposed time-of-use rate, and argued that the rate should be adjusted from an exact cost basis and be made revenue neutral . . . .

> . . . .

> The company's proposal as modified by the suggestions of [the OCA witness] should be adopted. This averts the need for a $1.86 million revenue loss which would have to be borne by other customers.

Differences in rates between customer class based on such criteria as the quantity of electricity used, the nature of use, the time of use, or the pattern of use are "not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation." *United States Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 173, 190, 390 A.2d 865, 873 (1978). Finding the surcharge and credit rates supported by competent evidence and not in error of law, we reject the Association's argument.

Affirmed.[8]

### ORDER

The order of the Pennsylvania Public Utility Commission entered May 21, 1982, at No. R-811626 is affirmed.

---

[8] Since we are affirming the order of the Commission, we need not address the Commission's motion to strike portions of the Association's brief.