538 A.2d 959

Carbonaire Company, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued November 20, 1987, before Judges MAC-PHAIL, PALLADINO, and Senior Judge KALISH, sitting as a panel of three.

*John M. Quain,* with him, *Norman James Kennard, Tucker Arensberg, P.C.,* for petitioner.

*Billie E. Ramsey,* Assistant Counsel, with her, *Bohdan R. Pankiw,* Deputy Chief Counsel, *Daniel P. Delaney,* Chief Counsel, for respondent.

*John H. Isom,* with him, *Jesse A. Dillon, Morgan, Lewis & Bockius,* for intervenor, Union Gas Company.

OPINION BY JUDGE PALLADINO, February 29, 1988:

Carbonaire Company, Inc. (Petitioner) appeals from three orders of the Pennsylvania Public Utility Commission (PUC), which orders had the effect of denying Petitioner eligibility for various special rates set by the PUC.

The facts are long and complicated, but must be recited in order to properly frame the issues before us. With the hope that those interested will benefit from thorough exposition, we begin by setting forth the players in this proceeding. Union Gas Company—Lehighton District (Union) is a regulated public utility which sells natural gas and provides transportation service (of customer-owned natural gas) to the public. Both Petitioner and New Jersey Zinc Company, Inc. (NJZ) are industrial customers of Union. NJZ operates a zinc

smelter in Palmerton, Carbon County, Pennsylvania, and is a major producer of certain zinc products. Petitioner, which was spun off from NJZ in 1984, produces ammonia and carbon dioxide products and has a "symbiotic" relationship with NJZ.[1] The other major player in this drama is the Transcontinental Gas Pipe Line Corporation (Transco), an interstate pipeline company which sells and transports natural gas. Up until the latter part of 1985, Transco provided transportation service, on an interruptible basis, to both Petitioner and NJZ.[2] It is important to note that although Petitioner and NJZ are similarly situated with regard to their method of purchasing and obtaining natural gas, they do not utilize the gas in the same way. NJZ is considered an end-user (November 13 order, p. 2) (*i.e.*, uses natural gas as a heat source), while Petitioner uses natural gas as a raw material in the production of ammonia and carbon dioxide. The record indicates that up until the unfortunate breakdown of harmonious co-existence among all the players, NJZ's normal gas usage was 3,000 Mcf per day (November 13 order, p. 5), while Petitioner's normal usage was 3,700 Mcf per day (November 13 order, p. 6).

With exposition of the players complete, we begin our examination of the plot, from our vantage point in the loge, consisting of a series of PUC orders impacting upon the operation of NJZ, Petitioner and Union. The

---

[1] For example, Petitioner leases NJZ's low pressure steam, treated water and short-line railroad facilities. PUC decision, order entered November 13, 1985, p. 6.

[2] The natural gas being transported by Transco to NJZ and Petitioner up until this time was being purchased from various private producers and marketers. November 13 order, p. 2. NJZ was paying $3.30 per Mcf for this private gas. *Id.* At that time, Union's prevailing rate was $6.70 per Mcf. *Id.* Although Union had a role in providing transportation to NJZ and Petitioner, neither company was purchasing gas from Union. *Id.*

catalyst for this flurry of proceedings before the PUC took the form of regulations promulgated by the Federal Energy Regulatory Commission (FERC). The FERC order in question, issued on October 5, 1985, set forth rules governing the transportation of natural gas to end-users, such as NJZ. On October 24, 1985, Transco announced it would not be providing service to NJZ under the new regulations. Transco stated its intent to stop service to NJZ as of November 1, 1985. Faced with the alternatives of shutting down production or purchasing gas from Union at the $6.70 per Mcf prevailing Union rate, NJZ petitioned the PUC for emergency relief and requested that the PUC establish a reduced temporary rate for the gas NJZ was going to have to purchase from Union, averring that it could not afford to pay Union's prevailing rate. One day later, on October 31, 1985, Union filed a similar petition and offered a temporary solution to NJZ's transportation problem. The solution called for Transco to transport a quantity of gas to a storage field on October 31, 1985. The stored gas would then be distributed to NJZ by Union, as needed by NJZ. The maximum storage capacity would be utilized, and it was estimated the stored gas would supply NJZ's needs for 25 days.

The PUC, by order entered November 13, 1985, approved Union's request for emergency relief, with some modification. The PUC's order stated that the special rate (of $3.16 per Dth[3]) for the storage supply of gas was to be effective for service rendered on and after November 1, 1985. The PUC also expressly stated that the rate was set pursuant to §1308[4] of the Public Utility Code.

---

[3] Dekatherm.

[4] Act of May 28, 1937, P.L. 1053, *as amended,* 66 Pa. C. S. §1308.

On November 26, 1985, Union filed a second application for emergency relief, requesting establishment of a new rate schedule for service to large industrial customers. Union noted that the only customers qualified for this industrial rate would be Petitioner and NJZ. Union sought a rate of $4.35 per Dth and listed various contingencies which would terminate the special rate. Protests to Union's application were filed by NJZ, the Carbon County Commissioners and the Office of Consumer Advocate (OCA). After consideration of the application and the protests, the PUC set, by order entered December 16, 1985, a special rate of $4.09 per Dth,[5] such rate to become effective upon exhaustion of the supply of the stored gas.[6] The PUC expressly stated that this rate was set pursuant to §1310,[7] which provides for the establishment of temporary rates. The PUC found §1310 applicable because there had been no hearing for the setting of this rate and because a temporary rate remains subject to oversight by the PUC.

Prior to entry of the PUC's order on December 16, 1985, Union filed a third application with the PUC, on December 11, 1985, requesting a special rate for NJZ only. Union sought a rate of $3.86 per Dth.[8] The PUC approved Union's requested rate with the proviso that Union not collect from other customers any of the costs associated with offering this rate to NJZ. The $3.86 per Dth rate, set pursuant to §1308 of the PUC Code, was in lieu of the rate approved by the PUC's order adopted December 5, 1985 and entered December 16, 1985. The $3.86 per Dth became effective for service to NJZ on January 10, 1986.

---

[5] $4.09 per Dth is equivalent to $4.23 Mcf.

[6] The rate became effective on December 18, 1985.

[7] 66 Pa. C. S. §1310.

[8] $3.86 per Dth is equivalent to $4.00 per Mcf.

On January 8, 1986, Petitioner filed a letter/petition, dated December 31, 1985, requesting that the PUC extend Petitioner's term of eligibility for the rate set by the PUC order entered December 16, 1985. Specifically, Petitioner sought retroactive application of the $4.09 per Dth rate back to December 3, 1985,[9] the day on which Transco ceased service to Petitioner.[10] On January 16, 1986, Union filed a formal response to Petitioner's letter/petition, wherein Union stated it had no objection to Petitioner's request, so long as any short-fall could be recovered from other ratepayers.

By order entered February 6, 1986, the PUC denied Petitioner's request, stating, in part:

> After thorough review and consideration of the instant petition and responsive pleading, the Commission concludes that Carbonaire's request should be rejected. This determination is reached independent of any consideration of the legal issue inherent in the petition regarding retroactive ratemaking. Contrary to the petitioner's allegation that no party would be affected, it is clear that either Union or, in the alternative, all other customers with the exception of NJZ would be adversely impacted. For the Commission to refuse to allow Union to pass the $138,750 revenue loss along to other customers could arguably constitute an unconstitutional deprivation of property. On the other hand, to pass on to other customer classes, without notice and the opportunity for hearing, revenue losses to Union resulting from approval of Carbonaire's request could constitute denial of due process.

---

[9] The $4.09 per Dth went into effect on December 18, 1985.

[10] The PUC has not explained why Transco ceased service to Petitioner. However, Petitioner asserted, in its letter/petition of April 16, 1986 that Transco interrupted service whenever it perceived capacity constraints on its line.

Other than the fact that Carbonaire wishes to effect a one-time saving of $138,750 in gas costs, no 'emergency' is alleged which suggests that it might be appropriate for the Commission to grant the relief requested. The Commission has not been told that any Carbonaire sales will be lost, that any raw materials will not be purchased, that Carbonaire will be burdened with any permanent financial difficulties, or that any of its 47 employees will be laid-off as a direct consequence if the relief sought is not granted.

Moreover, by Carbonaire's own averments, the Commission has been made aware that there exist a number of differences which effectively serve to distinguish the factual situation originally involved in the assignment of emergency volumes to NJZ. Specifically it was, in part, the significantly larger number of NJZ employees as well as the threat of immediate shut-down which influenced the Commission to approve special rates to NJZ. Additionally, as noted in Carbonaire's petition, Union sales to Carbonaire are approximately 23% higher than to NJZ (3,700 Mcf/day versus 3,000 Mcf/day) thus the revenue impact of any rate reduction to Carbonaire is that much more significant in terms of potential increases in rates to other customer classes. The Commission also observes with interest Carbonaire's claim that it cannot stay in business, even at the $4.20/Mcf rate, for any sustained period. That being the case, granting the requested one-time saving of $138,750 via retroactive application of the new rate may serve no useful purpose other than to defer the inevitable—all at the expense of either the utility or other customer classes.

> In conclusion, we note that by its very nature, transportation service is fraught with risk. Carbonaire assumed that risk and enjoyed for some time significantly lowered gas costs. To effectively shift, as now requested by Carbonaire, any part of the risk inhereint [sic] in transportation service to other customers, or to the utility itself, is simply inappropriate. . . .

February 6 order, pp. 2-3.

Petitioner did not respond to this denial until April 16, 1986, when it filed a second letter/petition, dated April 8, 1986, in which it requested: 1) a conference between all interested parties to address the issues raised by the letter/petition; 2) reconsideration of the denial of retroactive application of the $4.09 per Dth rate; and 3) that Petitioner be declared, *nunc pro tunc*, eligible for the temporary rate ($3.16 per Dth) established, by order entered January 8, 1986, for NJZ only. In its letter/petition Petitioner contended the rates set solely for the benefit of NJZ were discriminatory.

By order entered August 27, 1986, the PUC denied the relief requested by Petitioner. The opinion in support of the order entered August 27, 1986 provides a history of the proceedings before the PUC and then goes on to discuss, in considerable detail, an antitrust suit brought by NJZ against Union and Transco in the United States District Court for the Eastern District of Pennsylvania. The August 27, 1986 opinion states that the $3.16 rate set, for NJZ only, by order entered January 8, 1986, was an "outgrowth" of a meeting designed to settle disputes among NJZ, Union and Transco. In fact, Union, in its application for the $3.16 rate, had set forth the elements of a proposed settlement of the antitrust litigation. The proposed settlement provided, *inter alia*, that Transco would file applications with the FERC allowing Transco to again provide service to NJZ. The

proposed settlement further provided that Transco would file an application with the FERC authorizing a reduction in the level of Union's contract demand from Transco. Union estimated that a reduction in the contract demand would correspondingly reduce Union's annual demand charge by $1 million.

Based on its review of the proceedings, the PUC rejected Petitioner's contention that Petitioner and NJZ were so similarly situated that identical rates had to be charged to both companies. The PUC concluded that the rates set were not unlawfully discriminatory and denied Petitioner's requests. Petitioner has appealed to this court.

We begin by noting that Petitioner has appealed from three of the PUC orders, namely, the orders entered on January 6, 1986, February 6, 1986, and August 27, 1986. We will address Petitioner's arguments concerning the August 27 order, but, for the reasons set forth below, we grant the PUC's motion to quash as untimely Petitioner's appeal from the two earlier orders.

In its brief in opposition to the PUC's motion to quash, Petitioner asserts that because all the orders in question were interrelated and part of an ongoing proceeding, it is only fair that we review the order as a single resolution of the problems created by Transco's interruption of service to both NJZ and Petitioner. We decline to do so. Petitioner has cited no law in support of its interrelationship argument, and, aware as we are that the time for the filing of an appeal is jurisdictional,[11] we are not inclined to consider Petitioner's argument as warranting an exception to well-settled law.[12]

---

[11] *Ormes v. Department of Public Welfare,* 98 Pa. Commonwealth Ct. 588, 512 A.2d 87 (1986).

[12] During oral argument, Petitioner suggested that the orders in question set temporary rates and were therefore interlocutory and non-appealable. Assuming, arguendo, that temporary rates set

Accordingly, we will address only the issues raised with regard to the August 27, 1986 order.[13]

In its order of August 27, 1986, the PUC denied: 1) Petitioner's request for a meeting between the parties; 2) Petitioner's request for reconsideration of the PUC order denying Petitioner retroactive eligibility for the rate set by order entered December 16, 1985; and 3) Petitioner's request that it be declared, *nunc pro tunc*, a beneficiary of the rate set by order entered January 8, 1986. Petitioner contests the latter two provisions of the order. Before we begin our analysis, we emphasize that we may only review Petitioner's assertions of error with regard to the PUC's denial of reconsideration and its denial of Petitioner's eligibility for the rate set by the PUC order of January 8, 1986.

On appeal, Petitioner presents the following arguments: 1) the PUC's order of August 27 constitutes prohibited discrimination in rates because there is no reasonable factual distinction between the emergency situation of the two companies; 2) the PUC violated Petitioner's constitutional due process rights because the PUC order had the effect of requiring Petitioner to pay more than NJZ for natural gas, thereby impacting upon Petitioner's property rights; or 3) in the alterna-

---

pursuant to §1310 are interlocutory and non-appealable (as they were under prior, now repealed, law, *see Duquesne Light Company v. Pennsylvania Public Utility Commission,* 34 Pa. Commonwealth Ct. 50, 382 A.2d 991 (1978), Petitioner's argument does not persuade us. The only rate set under §1310 was the order setting the rate which benefited Petitioner. All other rates were set under §1308. Furthermore, Petitioner seeks to classify the rates as temporary for purposes of appealability and for purposes of retroactivity. However, Petitioner also asserts that further hearings were necessary because the rates set were permanent.

[13] Petitioner's appeal was filed on September 26, 1986 and was therefore timely with respect to the August 27 order.

tive, the order is not supported by substantial evidence.[14]

Our scope of review of the PUC's denial of reconsideration is limited to a determination of whether the PUC abused its discretion. *Baltimore & Ohio Railroad Co. v. Pennsylvania Public Utility Commission*, 77 Pa. Commonwealth Ct. 381, 465 A.2d 1326 (1983). Initially, we are troubled by the timing of Petitioner's request for reconsideration. The PUC denied Petitioner's initial petition by order entered February 6, 1986. Petitioner sought reconsideration of the February 6 order by its second letter petition, filed on April 16, 1986. Although we note in passing that our review of the record shows no abuse of discretion, we will not review the denial of a request for reconsideration which was not timely filed. Our reasoning is not altered by the fact that the PUC chose to address the substance of the untimely request. *See Brinks, Inc. v. Pennsylvania Public Utility Commission*, 16 Pa. Commonwealth Ct. 300, 328 A.2d 582 (1974).

Our scope of review of the remaining aspect of the August 27 order (denying Petitioner's request to be declared, *nunc pro tunc,* a beneficiary of the rate set by the PUC order entered January 10, 1986) is limited to a determination of whether an error of law has been committed, constitutional rights have been violated or if there is substantial evidence to support findings, deter-

---

[14] Petitioner also argues the PUC erred in classifying the rates set by its orders entered December 16, 1985 and January 8, 1986 as temporary. For the reasons set forth in our earlier discussion, we will not address this issue, as it has not been timely appealed. Additionally, we note that even if we were to address it, we would find it to be waived because of Petitioner's failure to raise the issue before the PUC. *See Hoskins Taxi Service, Inc. v. Pennsylvania Public Utility Commission,* 87 Pa. Commonwealth Ct. 18, 486 A.2d 1030 (1985).

minations or the order of the PUC. *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 512, 409 A.2d 446 (1979). Petitioner asserts: 1) the PUC erred as a matter of law because the rate benefiting only NJZ is unlawfully discriminatory; 2) Petitioner's constitutional right to due process has been violated because its property rights have been extinguished without a hearing; and 3) the PUC's order is not supported by substantial evidence. For the reasons set forth below, we affirm the order of the PUC.

Petitioner's first argument is that the rate set is unlawfully discriminatory. We disagree. As the PUC noted in its opinion supporting its February 6, 1986 order, there are significant differences between Petitioner and NJZ. For example, NJZ employs approximately 1100 workers while Petitioner employs 47. NJZ is an enduser while Petitioner uses natural gas as a raw material. Petitioner uses 23% more natural gas per day than NJZ. The PUC concluded that NJZ was suffering more serious financial burdens than Petitioner. Most significantly, NJZ was involved in antitrust litigation with Union and Transco, and the rate set by the January 8 order was, in part, to accommodate Union's request, which request was made pursuant to settlement negotiations among the parties involved in the antitrust litigation. We hasten to note that we find it particularly significant that the PUC added an important proviso to its January 8 order, namely, that Union not collect any costs incurred by reason of the low NJZ rate from any other Union customers. Thus, although Petitioner and NJZ are similar in that both are industrial customers and both relied on Union and Transco for their supplies of gas, the differences between the companies are such that it was reasonable for the PUC to allow different rates. "Questions concerning the reasonableness of rates

and the difference between the rates are factual questions for the Commission, whose findings must be upheld if supported by competent evidence." *Building Owners and Managers Association v. Pennsylvania Public Utility Commission,* 79 Pa. Commonwealth Ct. 598, 602, 470 A.2d 1092, 1094 (1984). Because the rate established was not unreasonably discriminatory, it was not an error of law for the PUC to refuse Petitioner's request to be declared, *nunc pro tunc,*[15] a beneficiary of the rate.

Petitioner's remaining two issues require little attention from the reviewer. Petitioner's second argument is that its constitutional due process rights have been violated. However, Petitioner has not presented this court with any evidence of a property right to be protected by a hearing. Petitioner's argument amounts to the assertion that it is just like NJZ. Ergo, Petitioner reasons, because NJZ participated in hearings prior to establishment of the special rates, Petitioner is also entitled to a hearing. We cannot agree. Petitioner has no property interest in the lower rate offered to NJZ.

Petitioner's final argument is that there is not substantial evidence to support the PUC's order. Once again Petitioner's argument amounts to the assertion that it is just like NJZ and, therefore, it cannot possibly be proper to treat the two companies differently. Once again we disagree. As our discussion of Petitioner's discrimination argument makes clear, there are significant differences between NJZ and Petitioner. Petitioner would have us ignore those differences and declare that there is not substantial evidence to support the PUC order. We will not do so.

---

[15] Because the issue is not before us, we will not address the question of whether the PUC could make such a *nunc pro tunc* declaration.

Accordingly, the PUC's motion to quash Petitioner's appeal from the orders entered January 8, 1986 and February 6, 1986 is granted. The order of the PUC entered on August 27, 1986 is affirmed.

### ORDER

AND NOW, February 29, 1988, the Pennsylvania Public Utility Commission's order of August 27, 1986 in the above-captioned matter is affirmed and the Pennsylvania Public Utility Commission's motion to quash Petitioner's appeal from the orders of January 8, 1986 and February 6, 1986 is granted.