647 A.2d 302

**Irwin A. POPOWSKY, Consumer Advocate, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 15, 1994.

Decided Aug. 19, 1994.

A. Yes.
Q. Severe enough that you didn't feel it was necessary to give him a field sobriety test?
A. Yes.
(R.R. at 25a–26a.)

Susan Jin Davis, for petitioner.

Stanley E. Brown, Asst. Counsel, for respondent.

Before CRAIG, President Judge, and NEWMAN, J., and DELLA PORTA, Senior Judge.

DELLA PORTA, Senior Judge.

Irwin A. Popowsky, Consumer Advocate, petitions for review of a Public Utility Commission (PUC) order which adopted the initial decision of the Administrative Law Judge (ALJ) and denied the exceptions filed thereto by the Office of the Consumer Advocate (OCA).

On July 1, 1991, Public Service Water Company (Public Service) began furnishing water service to approximately 610 customers in a portion of Pike County known as The Escape. On April 2, 1992, MPW Utilities, Incorporated (MPW), a corporate affiliate of Public Service, began furnishing sewer service to customers at The Escape. On August 1, 1991 and April 17, 1992, Public Service and MPW, respectively, filed applications with the PUC to obtain certificates of public convenience. On May 11, 1992, the OCA filed a notice of intervention in the application of Public Service. The OCA also filed a protest against MPW's application. In the notice of intervention and the protest, the OCA raised the issue of the legality of the rates charged by Public Service and MPW.

On July 6, 1992, the ALJ was informed by the OCA that 22 customers of Public Service received notices that service would be discontinued on July 8, 1992. The ALJ held a hearing by telephone on July 7, 1992 and every active party who could be reached and who was available participated. On July 8, 1992, the ALJ issued an order (Order No. 6) which addressed two questions: (1) Is Public Service a de facto utility, permitted to terminate service to customers who fail to pay their bills; and, (2) If Public Service is permitted to terminate service, has its recent attempt to do so complied with current PUC regulations. The ALJ concluded that Public Service was a de facto utility and is permitted to terminate service to non-paying customers during the pendency of the application process so long as it complies with all PUC regulations. The ALJ also concluded that the notice given to customers by Public Service did not comply with PUC regulations and was therefore ineffective.

On July 9, 1992, the OCA filed a motion requesting the ALJ to issue a threefold order: (1) to certify the question to the PUC for review of whether Public Service, as a de facto utility, is permitted to terminate service to customers who fail to pay their bills; (2) to stay the effectiveness of Order No. 6 pending the resolution of that question; and (3) to prohibit Public Service and MPW from terminating any customers pending the resolution of that question. Thereupon the ALJ issued Order No. 7 which stayed the terminations while the OCA's motion was pending.

On July 22, 1992, the ALJ issued Order No. 8 in which, *inter alia*, he denied the OCA's motion to certify a material question and lifted the stay of customer terminations imposed by Order No. 7. The OCA then filed a petition for review with the PUC requesting that the PUC address the question of whether Public Service and MPW should be enjoined from enforcing collection of bills issued for water and sewer service without having a certificate of public convenience and without having a lawful tariff. The OCA also requested that the PUC issue an injunction preventing Public Service and MPW from forcing customers to pay bills that are issued without legal authority.

On October 13, 1992, the PUC issued an opinion and order in which it concluded that a de facto utility is subject to the requirements of the Public Utility Code (Code)[1] and the PUC's regulations. It further concluded that a de facto utility, absent any order of the PUC to the contrary, must continue the rates in effect during the pendency of the PUC's consideration of the initial tariff of the utility. The order of the PUC provided that Public Service and MPW must maintain the rates in existence at the time of the initiation of their respective applications; Public Service and MPW may proceed with termination of service for non-payment of bills only upon application to the presiding officer; and, Public Service and MPW must maintain water and sewer service until the entry of a final order in the PUC proceedings or until ownership of the water and sewer facilities is finally adjudicated.

1. 66 Pa.C.S. §§ 101–3315.

On July 27, 1992, Tatyana Pogorelov filed a formal complaint with the PUC against Upland Water Company, Public Service and MPW. In the complaint, Pogorelov alleged, *inter alia*, that (1) the tariff for water service was very high; (2) she is a summer resident but she is forced to pay for service the entire year; and (3) the purchase price of her land included sewer service. Pogorelov also alleged that the Escape Property Owners Association could operate the system less expensively. Pogorelov requested that the PUC determine a reasonable monthly tariff for water for permanent residents and for summer-only residents.

A hearing was held on January 13, 1993 and on February 19, 1993, an initial decision was issued. The ALJ found that Pogorelov owed $300.00 to Public Service for water service and $337.50 to MPW for sewer service. The ALJ also found that Public Service and MPW properly followed PUC termination procedures. The ALJ ordered Pogorelov to (1) pay $16.66 monthly for current water charges and $300 to retire the arrearage within 30 days of the date of the order, and (2) pay $112.50 quarterly for current sewer charges and $337.70 to retire the current sewer arrearage within 30 days of the order. The order further provided that if Pogorelov failed to adhere to the payment schedule, Public Service and/or MPW could terminate their services without further written notice.

On March 11, 1993, the OCA filed exceptions to the initial decision of the ALJ. The OCA argued that bills rendered by Public Service and MPW are illegal and collection cannot be enforced by termination of service. The Law Bureau of the PUC filed a reply to the OCA's exceptions in which it argued that because the OCA failed to appeal the October 13, 1992 order of the PUC, the doctrine of collateral estoppel applies to bar the OCA from relitigating the issue of whether a de facto utility may enforce the payment of bills for utility service without having a lawful tariff. On August 12, 1993, the PUC issued an opinion and order in which it agreed with the Law Bureau that the OCA is barred by collateral estoppel from raising the issue of the enforcement of the payment of bills by termination of service. The PUC denied the OCA's excep-

tions and adopted the initial decision of the ALJ. Appeal to this Court followed.

Our scope of review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law has been committed or whether the necessary findings of fact are supported by substantial evidence in the record. *GPU Industrial Intervenors v. Pennsylvania Public Utility Commission,* 156 Pa.Commonwealth Ct. 626, 628 A.2d 1187 (1993).

The OCA argues on appeal that the PUC erred in permitting Public Service and MPW to charge members of the public for providing utility services when they do not have either a certificate of public convenience or an approved tariff. The PUC argues that the issue of whether a de facto utility may charge for utility service during the pendency of its application has already been decided and the OCA is barred by the doctrine of collateral estoppel from relitigating that issue.

We first consider the applicability of the doctrine of collateral estoppel in the case *sub judice.* Collateral estoppel will preclude review of an issue when (1) an issue decided in a previous adjudication is identical to the issue presented in the present controversy; (2) there was a final judgment on the merits; (3) the party against whom the estoppel claim is made was a party, or was in privity with a party to the previous adjudication; and (4) the party had a full and fair opportunity to litigate the issue in the previous action. *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 137 Pa.Commonwealth Ct. 621, 587 A.2d 54 (1991).

The OCA argues that collateral estoppel does not apply because the PUC's order of October 13, 1992 was an interlocutory order and not a final judgment on the merits. The OCA argues that the August 12, 1993 order is the final judgment on the merits which it is properly appealing.

To be final and appealable, the judgment or order must end the litigation, dispose of the entire case or effectively

put the litigant out of court. *Eachus v. Chester County Tax Claim Bureau,* 148 Pa.Commonwealth Ct. 625, 612 A.2d 586 (1992). The finality of an order is a judicial conclusion which results from practical rather than technical interpretation, taking into account the order's ramifications. *AT & T Communications of Pa., Inc. v. Pennsylvania Public Utility Commission,* 131 Pa.Commonwealth Ct. 390, 570 A.2d 612 (1990). An indication that an order is not final is conditional language and a failure to advise that appeal rights must be exercised. *Lehigh Township v. Department of Environmental Resources,* 154 Pa.Commonwealth Ct. 647, 624 A.2d 693 (1993).

In the case before us, the order of the PUC provided that termination of service for non-payment of bills may only be effected upon application to the ALJ. The order, by its terms, contemplates continuing litigation. The order did not adjudicate the ultimate rights and liabilities of the parties, nor did it end the litigation, dispose of the entire case or effectively put the litigant out of court. We therefore conclude that the PUC's order of October 13, 1992 was not a final judgment on the merits and the doctrine of collateral estoppel does not apply.

■ We now turn to the merits of the appeal. The OCA argues that Public Service and MPW are operating illegally by providing utility services for compensation without certificates of public convenience. In support of this position, the OCA cites Section 1101 of the Code, 66 Pa.C.S. § 1101, entitled "Organization of public utilities and beginning of service." That Section provides, in pertinent part:

> Upon application of any proposed public utility and the approval of such application by the commission evidenced by its certificate of public convenience first had and obtained, it shall be lawful for any such proposed public utility to begin to offer, render, furnish, or supply service within this Commonwealth.

The OCA further argues that Public Service and MPW are charging untariffed rates in violation of Section 1303 of the

Code, 66 Pa.C.S. § 1303. That Section, entitled "Adherence to tariffs," provides:

No public utility shall, directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part.

The PUC argues that Public Service and MPW are de facto public utilities, subject to PUC regulation as though they held certificates of public convenience. As de facto public utilities, Public Service and MPW must meet the standards of service set forth in Section 1501 of the Code, 66 Pa.C.S. § 1501, which provides, in pertinent part:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission.

The PUC argues that under this Section, the PUC could require a de facto utility to continue to provide service to its customers during the pendency of the application proceedings. The PUC further argues that it could not be the intention of the General Assembly in enacting the Code, to require a de facto public utility to provide service while, at the same time, prohibiting it from receiving compensation for the service.

The PUC further points out that in Order No. 8 it directed Public Service and MPW to establish separate accounts for payments received from its customers. Should the rates charged by Public Service and MPW be determined to be

unreasonable, the PUC has authority pursuant to Section 1312 of the Code, 66 Pa.C.S. § 1312, to order refunds. Thus, the PUC argues, the interests of the customers are fully protected.

Finally, the PUC argues that *Pennsylvania Public Utility Commission v. Tenny*, 28 Pa.Commonwealth Ct. 501, 368 A.2d 1362 (1977), supports its position that a de facto utility is not prohibited from charging a reasonable rate during the pendency of the application proceedings.[2] That case is, however, inapposite.

In *Tenny*, the PUC issued an order finding a water service facility operated by Tenny to be a de facto public utility and requiring him to file an application for a certificate of public convenience to furnish water services and continue to provide adequate service to all customers upon payment of the monthly charges. Tenny filed the application for a certificate of public convenience which included a proposed schedule of rates for water service. Prior to the approval of the certificate, a tariff of rates for water services was filed in the name of Tenny. The application for the certificate of public convenience was subsequently approved by the PUC. Two years later, Tenny filed a tariff of rates which was rejected because the effective date of the proposed tariff was improper and because the tariff did not contain the supporting data required by the PUC's tariff regulations. Tenny twice refiled the tariff and it was returned by the PUC for the same reasons.

This Court entered a preliminary injunction enjoining Tenny from interrupting water services to any customers for nonpayment of bills computed pursuant to the proposed tariff. On further appeal, this Court concluded that Tenny could not bill his customers at rates not properly filed with the PUC. This Court also entered an order permanently enjoining Tenny from interrupting water service for nonpayment of bills computed pursuant to the proposed tariff.

2. The OCA also cites *Tenny*, but for the proposition that a de facto utility cannot enforce payment of bills through termination of services.

In *Tenny*, the public utility had a certificate of public convenience and had a tariff filed with the PUC. The issue before this Court was the rate the water company could properly charge for its service, the rate in the proposed tariff or the rate specified in the tariff filed with the PUC prior to the approval of the certificate of public convenience. The issue was not, as the PUC argues, whether a utility may charge a reasonable rate during the pendency of the application process. The order of the PUC, which required Tenny to continue to provide service, upon payment of the monthly charges, was not appealed by Tenny. Thus, this Court did not consider that question.

In *Bell Telephone Co. v. Pennsylvania Public Utility Commission*, 53 Pa.Commonwealth Ct. 241, 244, 417 A.2d 827, 828–29 (1980), this Court construed Section 1303 of the Code and stated: "[t]here can be no lawful rate *except* the last tariff published as provided by law.... Further, it is well established that in the absence of an exception by the Commission, a public utility may not charge any rate for service other than that lawfully tariffed...." (Citations omitted, emphasis in original.) In the case before us, because Public Service and MPW do not have tariffs, the rates they charge are not lawful under *Bell Telephone*. We therefore conclude that the PUC erred in ordering Tatyana Pogorelov, in the absence of a lawful tariff, to pay bills submitted to her by Public Service and MPW.

We acknowledge the goal of the PUC, to ensure the financial stability of public utilities during the application process. However, the Code is clear that a public utility must have a certificate of public convenience prior to rendering service, (Section 1101 of the Code) and no public utility may charge a rate other than the rate specified in its tariff, (Section 1303 of the Code). When the words of a statute are clear and free from all ambiguity, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b). *See also Marshall v. Port Authority of Allegheny County*, 524 Pa. 1, 568 A.2d 931 (1990) (in cases where the

language of a statute is clear and explicit, consideration of arguments based upon supposed contrary legislative intent is improper).

We further acknowledge the dilemma faced by the PUC, that while the Code has no provision allowing a utility company to charge for its services during the pendency of the application process, the company should be encouraged to continue to render services during this same period. The PUC's remedy for this apparent gap in the statutory scheme, lies with the Legislature.

The order of the PUC is reversed.

## ORDER

AND NOW, this 19th day of August, 1994, the order of the Public Utility Commission in the above-captioned matter is reversed.

NEWMAN, Judge dissenting.

I agree with the disposition of the majority with respect to the first issue of whether the doctrine of collateral estoppel was applicable to the matter. However, I disagree with the majority on the next issue of whether Public Service and MPW were operating illegally by providing utility services for compensation without certificates of public convenience and without having an approved tariff. Therefore, I dissent in part for the reasons that follow.

The majority holds that Public Service and MPW were operating illegally because they did not have certificates of public convenience prior to rendering service to the customers of the "Escape," and they charged rates without having an approved tariff with the PUC. The majority's holding effectively abolishes the principle of "de facto" utilities, a useful and practical method that the PUC, in its regulatory capacity, has consistently applied. In so doing, the majority unfortunately creates more problems than it intended to solve.

"De facto" public utilities provide a beneficial and effective means for the PUC to ensure that customers are not without necessary public services. PUC has required "de facto" utilities to continue providing service to their customers during the pendency of a Section 1102 application proceeding and to receive a *reasonable* rate in return. For instance, the PUC, in this case, specifically provided that Public Service and MPW would continue to charge the rates that were in effect at the time the companies applied for certification. Moreover, it is important to note that the PUC required Public Service and MPW to place all monies collected into a separate account in case the rate charged is later deemed unreasonable pursuant to Section 1312 of the Code, 66 Pa.C.S. § 1312. Under this regulatory scheme, the system would function effectively because customers would receive their utility services and the companies would receive a reasonable rate in return.

Instead, the majority has created a regulatory nightmare. For example, a "de facto" utility will not be able to provide service to its customers until the PUC furnishes a certificate of public convenience. Ideally, the PUC could issue a certificate of public convenience within a day's notice, however, it is beyond peradventure that under today's regulatory scheme, multiple practical problems foreclose such swift action.[1] Moreover, the utility also will not receive payment for any service provided to customers until the PUC provides it with an approved tariff setting forth acceptable rates. As this case evidences, this result is patently unfair and provides an unjust windfall to the customers of the "Escape." Finally, until a certificate of convenience is issued and a tariff is approved, customers of the "Escape" will scramble to acquire water and sewer service. It is a strong possibility that this service will be unregulated, inefficient, and unsafe.

1. In this case, Public Service and MPW filed applications for certificates of public convenience on August 1, 1991 and April 17, 1992, respectively. The record is silent as to why the PUC has taken an inordinate amount of time in providing the companies with the required certificates. The court is aware of the difficulty involved and the amount of time needed to review complicated documentation in these matters; however, the period here appears excessive, and this court hopes in the future that these matters are decided more promptly.

Accordingly, I dissent in part and would affirm the order of the PUC.