**PARKESBURG BOROUGH, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 13, 1996.

Decided Aug. 30, 1996.

James J. Marlowe, II, for Petitioner.

Terrence J. Buda, for Respondent.

Before FLAHERTY and LEADBETTER, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

## PROCEDURE

This case involves a dispute over responsibility for the State Street Bridge, located in the Borough of Parkesburg, Chester County. The bridge crosses over four electrified train tracks currently owned by the National Railroad Passenger Corporation (Amtrak). On June 13, 1996, we heard oral argument on the Pennsylvania Public Utility Commission's (PUC's) motion to quash the Borough's November 9, 1995 petition for review of the PUC's October 11, 1995 order. We also heard argument on the merits of that petition. We grant the PUC's motion to quash.

## BACKGROUND

This case has a long history, some of which is relevant to our disposition. The Pennsylvania Railroad Company erected the State Street Bridge prior to 1900 so that residents could travel between their homes and their places of employment or business.[1] By virtue of a February 6, 1888 borough ordinance (Ordinance No. 34), the railroad agreed to build the bridge and its approaches and to be responsible for any property directly damaged by the bridge and approaches.[2]

In an April 2, 1973 letter, the Penn Central Transportation Company, successor in interest to the Pennsylvania Railroad Company and then owner of the tracks running under the bridge, advised the PUC that the bridge was barricaded and closed to vehicular traffic due to failing floor beams, but that it was still open to pedestrian traffic. In response, the PUC issued an April 10, 1973 order, commencing an investigation of the bridge and directing that a hearing be set to receive testimony regarding problems with the bridge.

As a result of a May 2, 1974 hearing, the PUC issued a May 5, 1975 order directing the trustees of Penn Central (then in reorganization under the supervision of the United States District Court) to close the pedestrian sidewalks, to make interim repairs to the deck and to prepare plans and estimates for rehabilitation of the bridge. The trustees of Penn Central filed a May 27, 1975 petition with the PUC requesting full and complete relief from the May 5, 1975 order. Subsequently, the interests of Penn Central in the State Street Bridge passed to the Consolidated Rail Corporation and then Amtrak.

The PUC never took any action on Penn Central's May 27, 1975 petition for relief. Approximately five years later, the PUC issued an August 29, 1980 emergency order therein directing the Borough, at its own initial cost and expense, to erect and maintain barricades adequate to prevent pedestrian access to the bridge's sidewalks.

At a July 9, 1992 field investigation and conference at the bridge site, none of the parties present would agree to perform any repairs or to accept maintenance responsibility for the bridge. In September of 1992, Amtrak sent the PUC a letter therein expressing concern for the condition of the bridge as it related to the tracks below and recommending that the bridge be removed.

As a result of a June 30, 1993 hearing, the PUC adopted a May 18, 1994 *tentative* decision and order, determining in part that, since the structure was located on a Borough street, the Borough must bear the *initial* costs and expenses both for preparing plans to remove the bridge and for its actual demo-

---

1. (Item No. 8 of Original Record.)

2. (Item No. 35 of Original Record.)

lition and removal. On May 31, 1994, the order was entered.

In its May 1994 decision, the PUC ordered, inter alia, that

> upon completion of the work herein ordered, and upon receipt of written request by any party hereto, this proceeding be scheduled for hearing at a time and place assigned by this Commission, upon due notice to all parties, to *receive evidence relative to the allocation of initial costs incurred by the borough of Parkesburg and the non-carrier public utility companies, and any other matters relevant to this proceeding.*

(PUC's May 31, 1994 Decision and Order, Paragraph 17, p. 9) (emphasis added).

The PUC also noted in the May 1994 decision that it would become final within twenty days from the date of its entry unless exceptions were received within that time. The tentative decision became final on June 20, 1994 because the Borough's exceptions thereto were not timely filed.

On January 26, 1995, the Borough filed a petition to vacate and/or modify the PUC's June 20, 1994 interim cost allocation order and to reopen the PUC's investigation into the problem bridge. The Borough alleged that during the second week of August 1994, Amtrak had spent substantial time and effort working on the bridge. Thus, according to the Borough, Amtrak accepted ownership and responsibility for the bridge thereby releasing the Borough from any obligation to comply with the June 20, 1994 final decision.

The PUC dismissed the Borough's petition on October 11, 1995, stating as follows:

> There is no basis for the Commission to assume that Amtrak's emergency repairs to its catenary system rises to the level of ownership of the State Street Bridge structure.
>
> Further, Amtrak's emergency work involving its erection of chain link fencing at the north and south ends of the structure are in keeping with this Commission's Emergency Order issued August 29, 1980 as set forth by Amtrak in its Answer and New Matter.

(PUC's October 11, 1995 Decision and Order, p. 24.)

On November 9, 1995, the Borough filed a petition for review with this Court stating therein that it was appealing from the PUC's October 11, 1995 order. In its petition, the Borough set forth alternative orders for this Court to enter: an order remanding the case to the PUC for a full hearing on the petition to vacate and/or modify; an order stating that the bridge is, in fact, owned by Amtrak and that it has reclaimed ownership over the bridge; an order stating that Amtrak has been negligent in failing to maintain the bridge; and/or an order permanently enjoining the PUC from assessing any responsibility for the bridge against the Borough.

On May 31, 1996, the PUC filed a motion to quash the Borough's petition for review. For reasons set forth more fully below, we grant the PUC's motion to quash, but note that in making its final decision as to cost allocation, the PUC should consider this Court's recent decision in *City of Philadelphia v. Pennsylvania Public Utility Commission,* 676 A.2d 1298 (Pa.Cmwlth.1996).

## DISCUSSION

In the motion to quash, the PUC argues that, even though the Borough nominally is appealing from the October 11, 1995 order denying its petition to vacate and/or modify the June 20, 1994 interim cost allocation order, it essentially is seeking relief from the earlier May 1994 order directing it to prepare a plan for the removal and demolition of the bridge at its own initial cost and expense. The PUC contends that we should grant the motion because the May 31, 1994 order is interlocutory in that it contemplates further hearings in order to make a final allocation of the costs of the work performed on the bridge.

■ In paragraph 14 of its answer and new matter to the motion to quash, the Borough admits that the May 31st order is interlocutory. It argues, however, that it is petitioning for review from the final October 11, 1995 order denying its request for a hearing on the petition to vacate and/or modify the PUC's June 20, 1994 order.

After examining the Borough's petition for review, we must agree with the PUC that the relief sought relates to the admittedly interlocutory May 31, 1994 order and not the October 11, 1995 order. Most of the allegations in the petition for review are connected with cost allocation. Therefore, we conclude that the order being appealed from here is the May 31, 1994 order and will briefly state our reasons as to why it is interlocutory.

The definition of a final order is found in Pa. R.A.P. 341(b):

> (b) **Definition of Final Order.** A final order is any order that:
>
> (1) disposes of all claims or of all parties; or
>
> (2) any order that is expressly defined as a final order by statute; or
>
> (3) any order entered as a final order pursuant to subsection (c) of this rule.

As the PUC points out in its memorandum of law in support of motion to quash, the May 31st order specifically did not dispose of all claims. To the contrary, as we noted above, the PUC in paragraph 17 of its May decision ordered that, upon completion of the work ordered and upon receipt of written request by any party hereto, the PUC shall schedule a hearing to receive evidence relative to the allocation of initial costs incurred by the Borough and the non-carrier public utility companies, and any other matters relevant to this proceeding.

We have held that "[a]n indication that an order is not final is conditional language and a failure to advise that appeal rights must be exercised." *Popowsky v. Pennsylvania Public Utility Commission*, 166 Pa.Cmwlth. 690, 647 A.2d 302 (1994). Thus, given the fact that the PUC specifically advised the parties that further hearings would be necessary to resolve the final allocation of the initial costs, Pa. R.A.P. 341(b)(1) was not satisfied.[3]

In addition, the May 31, 1994 order is not an order expressly defined as a final order by

statute as contemplated in Pa. R.A.P. 341(b)(2). *Compare Pennsylvania Industrial Energy Coalition v. Pennsylvania Public Utility Commission*, 653 A.2d 1336 (Pa. Cmwlth.1995), *aff'd*, 543 Pa. 307, 670 A.2d 1152 (1996) (holding that a declaratory order issued under Section 331(f) of Public Utility Code, 66 Pa.C.S. § 331(f), to conclude an investigation initiated by the PUC is a final and appealable adjudication).

Finally, the requirements of Pa. R.A.P. 341(b)(3) have not been met. The PUC did not issue a final order as to one or more but fewer than all of the claims or parties upon the express determination that an immediate appeal would facilitate resolution of the entire case. Pa. R.A.P. 341(c).

Although we are quashing the Borough's petition for review, we note that our disposition does not end this case or resolve any issues as to the ultimate responsibility for the costs of demolition and removal of the bridge. There is still an ongoing cost allocation case before the PUC. In consideration of that ongoing proceeding, we reiterate here that there has been a change in the law since the PUC initially considered this matter. *See City of Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298 (Pa.Cmwlth.1996).

In paragraph 17 of the motion to quash, the PUC acknowledges that change and alleges that granting its motion would allow it the opportunity to consider *City of Philadelphia* when it allocates final costs in this case. In its memorandum of law in support of motion to quash, the PUC states that, ultimately it may determine that the costs initially allocated to the Borough be allocated to another party in light of our decision. We agree with the PUC's position.

*City of Philadelphia* also involved a bridge over railroad tracks. In that case, we considered cross-appeals by the City of Philadelphia and Conrail from a PUC decision (1) directing the City to incur the costs of performing an inspection, preparing construction

---

3. *See also City of Philadelphia v. Pennsylvania Public Utility Commission*, 73 Pa.Cmwlth. 355, 458 A.2d 1026, 1030 (1983) (holding that a PUC order directing the City of Philadelphia to install highway traffic signals at its initial cost and expense and stating that the matter of the final allocation of those costs be held in abeyance until completion of the project was not a final order.)

plans and reconstructing a bridge; and (2) directing Conrail, upon completion, to reimburse the City for 20% of the actual cost spent on the bridge. The PUC also held that it had no authority to order Amtrak to repair and maintain the bridge, citing the Third Circuit's decision in *National Railroad Passenger Corporation v. Pennsylvania Public Utility Commission*, 665 F.Supp. 402 (E.D.Pa.1987), *affirmed*, 848 F.2d 436 (3rd Cir.1988), *cert. denied*, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988) (*Amtrak I*).

In *City of Philadelphia*, we discussed the fact that Amtrak is exempt from a tax or fee imposed by a state and how that exemption affects its potential responsibility to pay maintenance costs for a crossing. We noted the apparent disagreement between the Third Circuit (*Amtrak I*) and the Second Circuit (*National Railroad Passenger Corporation v. City of New York*, 882 F.2d 710 (2nd Cir.1989), *affirming*, 695 F.Supp. 1570 (S.D.N.Y.1988) (*Amtrak II*)) as to whether those maintenance costs are a tax or a continuing maintenance obligation. We summarized the apparent disagreement: "the Second Circuit and the Pennsylvania courts consider such payments not to be a tax or fee but a continuing maintenance obligation, while the Third Circuit considers it a tax." *City of Philadelphia*, 676 A.2d at 1305.

After setting forth a thorough analysis, we determined as follows:

> Because the costs of repairing and maintaining the 41st Street Bridge are not a "tax" or "fee" from which Amtrak would be exempt, we vacate the PUC order and remand for it to make a new allocation of

costs considering all parties, including Amtrak.

*City of Philadelphia*, 676 A.2d at 1309.

Although our agreement with the Second Circuit is evident from our disposition in the *City of Philadelphia* case, we need not resolve those issues now. We merely note that *City of Philadelphia* is highly relevant to the ongoing cost allocation case before the PUC.

At oral argument before this Court, the Borough requested that we remand the case before us to the PUC for a hearing based on our recent *City of Philadelphia* case. Even though we must quash the Borough's petition for review, it still has an opportunity to request that the PUC take evidence on matters related to the final allocation of initial costs in the ongoing cost allocation case before the PUC. In other words, the Borough still may get what it wants, albeit through another avenue of relief.

## CONCLUSION

Because we find that the May 31, 1994 decision and order is interlocutory, we hereby grant the PUC's May 31, 1996 motion to quash the Borough's November 9, 1995 petition for review.

## ORDER

AND NOW, this 30th day of August, 1996, the petition for review filed by Parkesburg Borough for review of the Pennsylvania Public Utility Commission's Order dated October 11, 1995 is hereby quashed.