**TOWNSHIP OF MIDDLETOWN,**
Petitioner,

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 9, 1999.
Decided April 5, 1999.
Reargument Denied June 8, 1999.

Susan E. Line Boswell, Media, for petitioner.

Susan D. Colwell, Harrisburg, for respondent.

Before McGINLEY, J., PELLEGRINI, J., and NARICK, Senior Judge.

PELLEGRINI, Judge.

The Township of Middletown (Township) appeals from an order of the Pennsylvania Public Utility Commission (PUC) requiring it to pay for the costs and expenses associated with the maintenance, repair and inspection of Indian Lane Bridge prior to its removal and for the costs and expenses associated with the removal of that bridge.

This case involves the rail-highway bridge crossing at Indian Lane over and above the grade of the tracks owned and operated by Southeastern Pennsylvania Transit Authority (SEPTA) in Middletown Township, Delaware County, Pennsylvania. The bridge is known as the Indian Lane Bridge (Bridge). The Bridge, which was built in 1925 by the Pennsylvania Railroad Company, is a single span bridge with a timber deck. The Bridge connects the portions of Indian Lane on either side of the Bridge and is primarily used for vehicular traffic with limited pedestrians using the Bridge. On the Bridge are certain utility facilities of Pennsylvania Electric Company (PECO) and Bell Atlantic–Pennsylvania, Inc. (Bell Atlantic). Due to the Bridge's deteriorating condition, the PUC issued an order without a hearing on March 5, 1996, temporarily reassigning from SEPTA to the Township all costs and responsibilities associated with the maintenance and inspection of the Bridge and stated that a proceeding would be held to further investigate the matter.

The PUC issued this order because it had entered into a Consent Decree with SEPTA as a result of an action filed by SEPTA against the PUC for its failure to apply the exemption under 49 U.S.C. §§ 24301(1)[1] and 24501(g).[2] The exemption precluded the PUC from ordering SEPTA to inspect and maintain highway bridges over its rail lines at its own cost as specifically applied to the Woodland Avenue Bridge near 47th Street in Philadelphia.[3] In the Consent Decree, the parties agreed that the PUC was barred from assigning costs or responsibilities for inspection to SEPTA of *any* highway bridges at any above-grade crossings under the PUC's jurisdiction. The parties further agreed that the PUC would initiate or reopen proceedings regarding any above-grade crossing under its jurisdiction where SEPTA or its predecessor was made responsible for the inspection and/or maintenance of any highway bridge at such a crossing, and would reassign SEPTA's prior assessed cost or responsibility to parties other than SEPTA. The Indian Lane Bridge was one of the bridges listed in the Consent Decree for which the PUC was required to reassign costs and responsibilities. At no time was the Township a

---

1. 49 U.S.C. § 24301(1) provides the following in relevant part:

    Amtrak or a rail carrier subsidiary of Amtrak is exempt from a tax or fee imposed by a State, a political subdivision of a State, or a local taxing authority and levied on it after September 30, 1981.

2. 49 U.S.C. § 24501(g) provides the following:

    A commuter authority with which Amtrak Commuter could have made a contract to provide commuter rail passenger transportation under this chapter but which decided to provide its own rail passenger transportation beginning on January 1, 1983, is exempt, effective October 1, 1981, from paying a tax or fee to the same extent Amtrak is exempt.

3. The Consent Decree was approved by the United States District Court for the Eastern District of Pennsylvania on January 19, 1996.

party to the proceedings involving the Consent Decree.

The investigative proceeding was held before an Administrative Law Judge (ALJ).[4] Based on the testimony and exhibits that were presented, the ALJ found that the Bridge had been closed on February 22, 1985, due to a bearing failure. The ALJ additionally found that the Bridge was in the advance stages of deterioration and that the Township preferred to have the Bridge removed and replaced because it served the local community and merchants but it did not have sufficient funding to do so. However, the Township and SEPTA had respectively paid $15,000 and $25,000 towards the repair of the Bridge abutments in 1987. The ALJ also found that the Township had placed concrete barriers at the Bridge and signs indicating that the Bridge was closed and agreed to maintain those barriers and signs. SEPTA agreed to maintain its railroad facilities at the crossing. However, relative to all other costs associated with the Bridge, neither party agreed to pay for costs of maintenance, inspection and repair.

■ After considering both the Township's argument that it was not responsible for any other costs and that the PUC could disregard the Consent Decree[5] and SEPTA's argument that the PUC was legally bound to adhere to the Consent Decree, the ALJ recommended that although the Bridge was in the advanced stages of deterioration, it should not be removed or re-

placed. The PUC found there was no danger of the Bridge collapsing, but that it should remain closed and the Township should be required at its sole cost to inspect the Bridge at regular intervals—at least every two years – to report any significant changes to the PUC. The ALJ further recommended that based upon the evidence presented indicating that the Township had received significant benefits in the past from the Bridge, i.e., it had been used by the local community and merchants serving that community, and that the Township had previously contributed toward the cost of the Bridge's inspection and maintenance, the Township should be responsible for:

- maintenance of the substructure and superstructure of the Bridge;

- removal of snow, ice and debris from the highway approaches to the Bridge; and

- removal of snow, ice, debris and graffiti from the sidewalks on the highway approaches to the Bridge.

By order dated September 1, 1998, the PUC modified the ALJ's recommendations by ordering that the Township demolish the Bridge at its initial cost and expense to eliminate future maintenance or inspection costs and only maintain and inspect the Bridge until it was removed.[6] The PUC further ordered that after the Bridge was removed, a final hearing would be held regarding the final allocation of costs asso-

---

4. Present at the hearing were the Township; SEPTA; the Pennsylvania Department of Transportation (PennDot); Delaware County; the PUC's Bureau of Transportation and Safety; PECO and Bell Atlantic.

5. The Township made this argument based on this Court's holding in *City of Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298 (Pa.Cmwlth.1996), which held that federal statutes did not preclude the PUC from imposing on SEPTA costs and inspection and maintenance responsibilities for rail-highway crossings.

6. On September 28, 1998, the Township filed with the PUC a motion to amend its Septem-

ber 1, 1998 opinion and order by adding language indicating the order was interlocutory and certifying the case for an immediate appeal. The PUC alleged that because the Township filed its petition for review with this Court two days later, and it would have had to amend its September 1, 1998 order within 30 days – or by October 1, 1998, which was not enough time to act upon the motion and precluded it from amending that order. However, this argument is meritless because under Pa. R.A.P. 1311(b), the PUC had 30 days from the date the Township filed its motion to amend with the PUC to file a motion for certification with this Court.

ciated with that removal.[7] It is from this order that the Township filed an appeal with this Court.[8]

Initially, the PUC contends that this appeal should be quashed because its September 1, 1998 order was interlocutory. It argues that the order was not final because it only stated who was required to perform the initial work on the Bridge but not who was ultimately going to be held responsible for the associated costs. The Township, however, argues that even if the PUC's order was not final, it was entitled to appeal the interlocutory order as of right pursuant to Pa. R.A.P. 311 because it was deprived of the opportunity for a fair hearing on the allocation of costs.[9]

In a case very similar to this one—*Parkesburg Borough v. Pennsylvania Public Utility Commission*, 681 A.2d 872 (Pa.Cmwlth.1996)—the PUC ordered the Borough to bear the *initial* costs of preparing plans to remove the State Street Bridge as well as the costs for its actual demolition because it was located in the Borough even though it crossed over electrified train tracks owned by Amtrak. The PUC specifically stated in its order that upon completion of the work and upon receipt of a written request by any party, a hearing would be scheduled regarding the allocation of the initial costs incurred by the Borough. The Borough petitioned to vacate the PUC's order which the PUC dismissed. The Borough then filed a petition for review with this Court regarding the allocation of costs to which the PUC filed a motion to quash because the order from which the Borough was appealing was interlocutory.

We set forth the definition of a final order found at Pa. R.A.P. 341(b)[10] as one that disposed of all claims. We then noted that because the PUC's order had conditional language and failed to advise that appeal rights could be exercised, it did not meet the definition of a final order and the Borough's appeal was quashed. *See also City of Philadelphia v. Pennsylvania Public Utility Commission*, 73 Pa.Cmwlth. 355, 458 A.2d 1026 (1983) (order of PUC that final allocation of costs for City's installation of traffic signals to be held in abeyance until completion of project was not final and not reviewable by this Court).

■ Similarly, in this case, the PUC provided the following in its order:

> For these reasons, we determine that the bridge at the crossing should be removed and the crossing abolished. Accordingly, we will direct the Township, at its *initial* cost and expense, to prepare plans for the removal of the existing bridge. After the plans are ap-

---

7. The PUC also ordered SEPTA, at its own cost and expense, to maintain all railroad facilities and appurtenances at the Bridge crossing, including any paths and railings to the Bridge during the interim period between its order and the demolition of the Bridge. Both Bell Atlantic and PECO were ordered to maintain their utility facilities at the Bridge crossing during the same period at their own cost.

8. Our scope of review is limited to determining whether the PUC violated constitutional rights, committed an error of law, rendered a decision not supported by substantial evidence or violated its rules of practice. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 668 A.2d 615 (Pa.Cmwlth.1995).

9. The Township also argues that the PUC erred by refusing to consider SEPTA as a proper recipient of any costs or responsibilities associated with the Bridge above its railway tracks; federal exemption statutes do not bar the allocation of costs to SEPTA of rail-highway bridge crossings; and the Consent Decree does not bar the allocation of costs and responsibilities to SEPTA. Finally, the Township contends that the PUC's September 1, 1998 order was a final order because it was required to expend monies to maintain and inspect the Bridge as well as to demolish the Bridge.

10. Pa. R.A.P. 341(b) provides:

> A final order is any order that:
> (1) disposes of all claims or of all parties; or
> (2) any order that is expressly defined as a final order by statute; or
> (3) any order entered as a final order pursuant to subsection (c) of this rule.

proved, the Township will perform the removal, at its *initial* cost and expense. Subsequent to that, *we will hold a hearing to determine the final allocation of costs.* (Emphasis added.)

(PUC's September 1, 1998 order at p. 13.) Because the PUC's September 1, 1998 order specified that further hearings would be held regarding the final cost allocation following completion of the demolition of the Bridge, just as in *Parkesburg,* the order was interlocutory and not final.

Even if the PUC's order was interlocutory, the Township contends that it should be entitled to appeal because it could not get a fair hearing from the PUC because it entered into the Consent Decree with SEPTA in federal court agreeing that it would not allocate any costs against SEPTA in crossing cases. In *City of Philadelphia v. Public Utility Commission,* 676 A.2d 1298 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 546 Pa. 657, 684 A.2d 558 (1996), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997), we held that the Consent Decree at issue here violated due process rights because, "[b]y entering into the consent decree agreement not to allocate costs to SEPTA, the PUC has prejudged [the matter thereby depriving] those parties of

their due process rights to a full and fair hearing." *Id.* at 1307, note 16.[11]

■ Even though we agree with the Township that the PUC cannot give it a fair and impartial hearing as a result of the Consent Decree, that does not convert the interlocutory order into a final order or mitigate the Township's obligation to bring this matter to this Court in conformance with the Pennsylvania Rules of Appellate Procedure. If the Township wanted to appeal from the PUC's September 1, 1998 interlocutory order, within 30 days of that order it was required to file an application for an amendment of an interlocutory order with the PUC pursuant to Pa. R.A.P. 1311(b)[12] and request it to certify the matter to this Court. If the PUC agreed to certify the matter, using the language set forth in 42 Pa.C.S. § 702(b),[13] it would have then had 30 days to request this Court to take the appeal. In the event the PUC refused to certify the matter or did not act within 30 days of the Township's request making the request a deemed denial, pursuant to Pa. R.A.P. 1311(b), the Township would have then been permitted to file a petition for review directly with this Court from the PUC's interlocutory order.[14] While the Township

11. *See also City of Philadelphia v. Public Utility Commission,* 720 A.2d 845 (Pa.Cmwlth. 1998).

12. Pa. R.A.P. 1311(b) provides in relevant part:

Permission to appeal from an interlocutory order containing the statement prescribed by 42 Pa.C.S. § 702(b) may be sought by filing a petition for permission to appeal with the prothonotary of the appellate court within 30 days after entry of such order in the lower court or other government unit... An application for an amendment of an interlocutory order...shall be filed with the...government unit within 30 days after the entry of such interlocutory order and permission to appeal may be sought within 30 days after entry of the order as amended.

13. 42 Pa.C.S. § 702(b) provides the following: When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the

jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

14. The note to Pa. R.A.P. 1311(b) provides the following:

The 1997 amendment to subdivision (b) provides for a deemed denial where the trial court or other governmental unit fails to act on the application within 30 days. Under such circumstances, a party may need to file a praecipe for entry of the deemed denial pursuant to Rule 301(d).

Where the administrative agency or lower court refuses to amend its order to include the prescribed statement, a petition for re-

did request the PUC to amend its interlocutory order, *see footnote 4 supra,* when it did not respond to that request, it was incumbent upon the Township to file a petition for review with this Court seeking permission to appeal. Having not done so, the Township's appeal is not properly before us and its appeal is quashed.

### ORDER

AND NOW, this 5th day of April, 1999, the appeal filed by the Township of Middletown is quashed.

view under Chapter 15 of the unappealable order of denial is the proper mode of determining whether the case is so egregious as to justify prerogative appellate correction of the exercise of discretion by the lower tribu-nal. If the petition for review is granted in such a case, the effect...is the same as if a petition for permission to appeal had been filed and granted, and no separate petition for permission to appeal need be filed.