The Bell Telephone Company of Pennsylvania, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. University Health Center of Pittsburgh, Party Respondent.

Argued March 11, 1980, before President Judge CRUMLISH, JR., and Judges WILKINSON, JR., MENCER, ROGERS, CRAIG, MACPHAIL and WILLIAMS, JR. Judge BLATT did not participate.

242

*Edward W. Madeira, Jr.,* with him *Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Donald F. Clarke, Raymond F. Scully,* and *Daniel J. Whelan,* for petitioner.

*Allison K. Turner,* Assistant Counsel, with her *Shirley Rae Don,* Deputy Chief Counsel and *George M. Kashi,* Chief Counsel, for respondent.

*Stewart M. Flam,* with him *Wilbur McCoy Otto, Dickie, McCamey & Chilcote,* and *George A. Huber,* for party respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, July 24, 1980:

The Bell Telephone Company of Pennsylvania (Bell) appeals from an order of the Pennsylvania Public Utility Commission (Commission) reversing the decision of the Administrative Law Judge (ALJ) and remanding for a computation of Centrex connection costs under Bell's 1976 tariff. We reverse the Commission and hold that the ALJ's computation of costs under Bell's March 1, 1978 tariff was correct.

The pertinent facts may be summarized as follows: On June 8, 1976, the University Hospital Center of Pittsburgh (UHCP) contracted with Bell, by letter agreement, to convert four of its member hospitals and a clinic from Class E, PBX exchange systems, to a single Centrex system. Work was commenced on the cutover in June, 1976 and completed 21 months later on March 12, 1978. UHPC was aware at the time of the contract that installation of the system would take

at least 18 months, and there is no evidence of intentional delay on the part of Bell in installation.

On October 18, 1976, UHCP filed a complaint against Bell seeking an order by the Commission directing that under the agreement entered June 8, 1976, and Bell's tariff regulations in effect at that time, it was entitled to an exemption from termination and connection charges for all of its member institutions for conversion to Centrex service.

Bell maintained that the 1976 tariff qualified but one of the five conversion locations for exemption and that its proposed tariff revision, filed November 5, 1976, eliminated the exemption issue.

The record was held open by the ALJ pending the outcome of the proposed rate change proceeding.

Finally, on March 1, 1978, Bell's new tariff became effective. It eliminated the connection charge concept including any exemptions from connection charges and imposed a new six-element set of charges for conversion from Class E branch exchange systems to a single Centrex system.

On April 25, 1978, the ALJ released his initial decision, holding that the controlling tariff was the new March 1, 1978 tariff which eliminated the exemption for connection charges. Consequently, the ALJ did not determine how many "connection" charge exemptions UHCP was entitled to under the prior tariff. UHCP's complaint was dismissed for mootness.

UHCP and the Commission staff filed exceptions and on September 28, 1978, the Commission adopted its order reversing the initial decision and sustained UHCP's position that the controlling tariff was the one in effect on June 8, 1976, when it ordered the Centrex service. The case was remanded to the ALJ to determine which of the UHCP's member institutions were entitled to exemption under the 1976 tariff.

Bell has appealed to this Court.

The issue is whether the Bell tariff in effect when UHCP ordered the Centrex service in June, 1976 (1976 tariff), governs the charge for the establishment of that service or whether that charge is to be governed by the new tariff which was in effect when the service was established in March, 1978 (1978 tariff).

UHCP contends that the 1976 tariff applies and, based on its interpretation of that tariff that the service establishment charge is approximately $10,000. Bell, on the other hand, asserts that the 1978 tariff applies and that the establishment charge is approximately $39,000.

Section 1303 of the Public Utility Code, 66 Pa. C. S. §1303, provides in pertinent part:

> No public utility shall, directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part.

See *Duquesne Light Co. v. Public Service Commission,* 273 Pa. 287, 117 A. 63 (1922); *Leiper v. Baltimore and Philadelphia R.R. Co.,* 262 Pa. 328, 105 A. 551 (1918); *Byer v. Peoples Natural Gas Co.,* 251 Pa. Superior Ct. 75, 380 A.2d 383 (1977).

There can be no lawful rate *except* the last tariff published as provided by law, and the effective rate thus published supersedes all prior rates relating to the service therein called for. *Duquesne Light Co. v. Public Service Commission, supra.* Further, it is well established that in the absence of an exception by the Commission, a public utility may not charge any rate for services other than that lawfully tariffed, and con-

tracts fixing rates are superseded by the rate in effect at the time the service is delivered. *Duquesne Light Co. v. Public Service Commission, supra; Leiper v. Baltimore & Philadelphia R.R. Co., supra; Byer v. Peoples Natural Gas Co., supra; Blythe Township Municipal Authority v. Pennsylvania Public Utility Commission,* 199 Pa. Superior Ct. 334, 185 A.2d 628 (1962).

> Where parties enter into a contract which relates to a matter which may subsequently be the subject of revision by the State in the exercise of its police power, their contracts ... must be held subject to the right of the State to act in regard thereto. They cannot allege that the contracts, so far as the State is concerned, are inviolable. It is not, as we have already pointed out, because of the interest of the parties to the contract, or either of them, that it may be revised or modified, but because of the greater good resulting to the public at large.

*Leiper v. Baltimore & Philadelphia R.R. Co., supra,* at 335, 105 A. at 554.

Centrex telephone service was delivered by Bell on March 12, 1978, 11 days after the new tariff became effective. Under the law, Bell is compelled to impose the 1978 tariff for the establishment of that service regardless of whether a major portion of the underlying connection work was completed prior to the tariff's effective date.

The Commission and UHCP maintain that the service rendered in the case at bar is non-recurring in nature and that the "contract" between the parties is divisible into two separate parts: the first, calling for the installation of Centrex equipment, and the second for the switchover and supply of Centrex telephone service. On this basis, they assert that the long-standing principles enunciated in *Leiper v. Baltimore*

& *Philadelphia R.R. Co., supra,* and *Byer v. Peoples Natural Gas Co., supra,* were not intended to apply to the installation service which must be governed by the tariff in effect at the date of the contract and when the majority of the work was performed. .

In addressing the merits of this argument, let us say at the outset we are unconvinced by the Commission's reasoning with regard to the divisibility of the contract.[1] This notwithstanding, whether the contract is divisible and non-recurring, is of no legal consequence in reaching the result.

The Public Utility Code, 66 Pa. C. S. §1303, forbids the discrimination in rates between customers for *any service* rendered or to be rendered. No distinction is made between recurring or nonrecurring service. To the contrary, service as used in the statute has been defined in its broadest and most inclusive sense considering equally recurring and non-recurring activities and costs. *Behrend v. Bell Telephone Co.,* 242 Pa. Superior Ct. 47, 363 A.2d 1152 (1976); Section 102 of the Public Utility Code, 66 Pa. C. S. §102.

In addition to *Byer v. Peoples Natural Gas Co., supra,* the Court held that the nature or form of the contract could not affect the Commission's power to change its terms by imposing new rates.

---

[1] The recorded facts indicate that the so-called "installation" charge to UHCP is not comparable to the actual cost of the installation and purchase of equipment necessary to deliver the Centrex service. Under the 1978 tariff, UHCP's total installation cost will equal $39,000, whereas the approximate cost to Bell of establishing the service was $900,000. Thus it is apparent, at least from Bell's viewpoint, that the sale and installation of equipment was not the business purpose of the contract.

Moreover, at the time of contracting, it may logically be inferred from the nature of the commodity and the business of the parties that UHCP's major concern at the time of contracting was the receipt of a more efficient means of telephone communications, not the underlying activities which had to occur prior to delivery.

Finally, as early as *Leiper v. Baltimore* & *Philadelphia R.R. Co., supra,* the Supreme Court established that the State's power to set rates could not be superseded by the terms of a pre-existing contract regardless of the definite or indefinite time limitations.

UHCP argues that in fairness and equity, this Court should affirm the Commission's order which upheld the applicability of the 1976 tariff since it was induced by the costs presented at that time to purchase the Centrex system.

Although presented in a procedurally different posture,[2] the power of the Pa. PUC and the court to adjudicate what is really no more than a private contract dispute was enunciated in *Byer v. Peoples Natural Gas Co., supra.* There, the claimants averred that they were induced to purchase air conditioning systems by Peoples' promise to provide them with a special gas rate for air conditioning use from May 15 to October 15 of each year during the lifetime of the systems. The special discount was eliminated by a new Pa. PUC tariff fixing electrical rates.

Claimants sought as damages the exchange of value contemplated by the alleged sales contract and the amount they would be required to pay under the new tariff. The Court held that the Pa. PUC had no power to decide private contract disputes. Jurisdiction over suits for damages based on negligence or breach of contract wherein a utility's performance of its legally imposed and contractually adopted obligations are examined and applied to a given set of facts is in the Courts. *See also Feingold v. Bell Telephone Co.,* 477 Pa. 1, 383 A.2d 791 (1978); *Behrend v. Bell Telephone Co., supra.*

Thus, the appropriate forum for relief would be for UHCP to bring a contract action in common pleas

---

[2] Complaint in assumpsit.

court. This Court cannot affirm the Commission's opinion on contract grounds.

Accordingly, we

## ORDER

AND Now, this 24th day of July, 1980, the order of the Pennsylvania Public Utility Commission dated September 28, 1978, is reversed. University Hospital Center of Pittsburgh's cost for the establishment of Centrex service shall be computed in conformance with Bell of Pennsylvania's 1978 tariff structure.

Judge WILLIAMS, JR., dissents.