**PHILADELPHIA SUBURBAN WATER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 13, 2002.
Decided Oct. 21, 2002.

Daniel Clearfield, Harrisburg, for petitioner.

Stanley E. Brown, Harrisburg, for respondent.

John S. Carnes, Jr., West Chester, for amicus curiae, The City of Coatesville Authority and The City of Coatesville.

John J. Gallagher, Harrisburg, for amicus curiae, PA American Water Co.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Philadelphia Suburban Water Company (Suburban Water) petitions for review of an adjudication of the Pennsylvania Public Utility Commission (PUC or Commissioners) approving several agreements by which the City of Coatesville Authority (Authority) sold its water system to the Pennsylvania–American Water Company (Pennsylvania–American).[1] Specifically, Suburban Water challenges the PUC's approval of an Asset Purchase Agreement (Agreement) that obligates Pennsylvania–American to make an annual contribution, in perpetuity, to the Coatesville Economic Development Fund in an amount exactly equal to the annual rates paid by the City of Coatesville (Coatesville) to Pennsylvania–American for fire hydrant service. Suburban Water contends that this arrangement effects free water service to Coatesville and, further, that free service deviates unlawfully from Pennsylvania–American's approved tariff and discriminates against municipalities that pay the utility's approved tariff for their fire hydrant service. We agree and reverse the PUC's approval of this provision of the Agreement.

## HISTORY OF THE CASE

In 1998, Coatesville announced that it would accept bids for the acquisition of its waterworks system, stating that the bid had to include free fire hydrant service to Coatesville, in perpetuity, as a non-nego-

tiable term.[2] Suburban Water, a putative bidder, sought a declaratory order from the PUC on the question of whether Coatesville's non-negotiable bid term was lawful under the Public Utility Code. The PUC heard the case and on October 1, 1999, entered an order that did not directly address the validity of the bid term. Instead, it simply recited the law, stating that: (1) the acquisition of Coatesville's water system must be reviewed and approved by the PUC, and (2) the utility chosen as purchaser must "charge rates that are consistent with its approved tariff rate."

On February 9, 2000, having been selected as the winning bidder, Pennsylvania–American submitted an application to the PUC requesting approval of the proposed acquisition. Attached to its application was the Agreement, which provided that Pennsylvania–American would pay Coatesville $37,000,000 for its water system and, *inter alia*, would give Coatesville free fire hydrant service in perpetuity (Free Service Covenant). In response, protests were filed by the Office of Consumer Advocate (OCA), the Office of Trial Staff (OTS) and Suburban Water. All protestants asserted that the Free Service Covenant violated the Public Utility Code as well as the PUC's October 1, 1999 declaratory order. Hearings were conducted on Pennsylvania–American's application and the protests it generated.

---

1. The Authority also sold its wastewater system, but that asset sale is not implicated in this appeal. The transactional documents as well as the PUC's adjudication refer to Pennsylvania–American Water Company as "PAWC"; the adjudication refers to Suburban Water as "PSW."

2. The request for proposal put out by the Authority and Coatesville City Council provided:

 **FIRE HYDRANT FEES**

 It has been decided that the Non-negotiable Term for free fire hydrant services for the City in perpetuity remains a requirement. *The City will never pay any such fees.* The successful Proposer will be required to make *whatever arrangements necessary to waive or pay these charges on behalf of the City.* Proposals may not be conditioned upon PUC approval of this requirement. Reproduced Record 22a (R.R. ———) (emphasis added).

After the evidentiary portion of the proceeding, but prior to the submission of briefs, the Agreement was · amended (Amendment), by which Pennsylvania–American reached a settlement with some, but not all, of the protestants. The Amendment deleted the Free Service Covenant from the Agreement and replaced it with a new provision by which: (1) Pennsylvania–American agreed to bill Coatesville for the hydrant service as provided in Pennsylvania–American's tariff; (2) Coatesville agreed to pay Pennsylvania–American the invoiced amount; and (3) Pennsylvania–American agreed to make an annual contribution to the Coatesville Economic Development Fund in an amount equal to Coatesville's annual charge for fire hydrant service. In addition, Pennsylvania–American agreed to use "shareholder funds," rather than "ratepayer funds," to make these contributions. The question of whether the Agreement, as revised by the Amendment, satisfied the Public Utility Code was briefed by Suburban Water, Pennsylvania–American and Coatesville.

On January 19, 2001, the Administrative Law Judge, Louis G. Cocheres (ALJ), issued an Initial Decision recommending that Pennsylvania–American's acquisition of the Coatesville waterworks system be approved, subject to certain amendments to the Agreement. Specifically, he recommended deletion of both the Free Service Covenant and the Amendment for the reason that they violated the Public Utility Code. The ALJ concluded that the Amendment did not cure the deficiencies of the Free Service Covenant, reasoning as follows:

> [T]he City is still receiving free hydrant service. And free hydrant service continues to contradict PAWC's tariff and the Declaratory Order. Any attempt by PAWC to characterize the changes set forth in the Amendment as a "charge and contribution" format is nothing more than an untenable form over substance argument.

R.R. 288a.

Pennsylvania–American and Coatesville filed exceptions to the ALJ's Initial Decision, and Suburban Water responded to them. On February 13, 2001, the Commissioners, in a 4–1 vote, rejected the ALJ's recommendation to delete the Amendment and, instead, approved it subject to the establishment of a tracking mechanism designed to ensure that only shareholder funds would be used to make the annual payments to Coatesville's Economic Development Fund. Commissioner Terrance J. Fitzpatrick, in dissent, concluded that the Amendment was illegal, noting that the Public Utility Code prohibits Pennsylvania–American from "directly or indirectly" charging any rate other than that in its scheduled tariff.

On September 4, 2001, approximately six months after it sought this Court's review of the PUC's decision in this case, Suburban Water, along with the Borough of Chalfont (Chalfont), submitted an application to the PUC seeking approval of Suburban Water's acquisition of Chalfont's water system. As part of this transaction, Suburban Water agreed that it would not charge Chalfont for fire hydrant service for three years, but after this grace period, Suburban Water would charge Chalfont a gradually increasing hydrant service charge until the charge equaled Suburban Water's tariff for hydrant service. After a hearing, on October 25, 2001, the PUC approved the transaction between Suburban Water and Chalfont.

Suburban Water seeks to have this Court reverse the PUC's approval of the Agreement to the extent it includes either the Free Service Covenant or Amendment. The heart of Suburban Water's challenge is that the Amendment violates two provi-

sions of the Public Utility Code, *i.e.*, the Section 1303 prohibition against a utility charging any rate other than that specified in its tariff and the Section 1304 prohibition against establishing unreasonable differences between classes of service. 66 Pa.C.S. §§ 1303, 1304. In addition to defending its approval of the Amendment on its merits, the PUC argues that Suburban Water is judicially estopped from pursuing its appeal because Suburban Water's contract for the purchase of Chalfont's water system includes a provision for free hydrant service. Pennsylvania–American and Coatesville have intervened in this appeal to respond to Suburban Water and to support the PUC.

## SECTION 1303 OF THE PUBLIC UTILITY CODE

■ The Amendment was not the first choice of Pennsylvania–American and Coatesville. It was developed to meet the objections of the OTS, the OCA and Suburban Water to the Free Service Covenant. Whether the Amendment has transformed the Agreement from one that violates the Public Utility Code[3] into one that satisfies it is the central issue before us. It cannot be resolved without evaluation of the Free Service Covenant, which, if valid, moots the objection to the Amendment.

The Free Service Covenant is one of the several covenants found in Article 3 of the Agreement. In relevant part, the Free Service Covenant provides as follows:

3. The applicants in the proceeding below did not agree that the Free Service Covenant was legally deficient. Indeed, Pennsylvania–American and Coatesville continue to assert that in the context of a sale of assets, free service to the seller is an appropriate term for negotiation particularly where, as here, the seller is a financially challenged, aging municipality. It further argues that the PUC has

### 3.4 Special Covenants of PAWC for the Water System

*PAWC hereby covenants and agrees to comply with the following special covenants relating to the Water System:*

(a) ***Rates.*** At Closing, PAWC shall implement, in the area currently served by the Water System, CCA's water rates then in effect as of December 16, 1999. PAWC shall freeze said rates for a minimum of three (3) years following Closing during which time no other rates shall be charged in the area served by the Water System. PAWC shall have the option, at any time, to charge rates lower than CCA's water rates in effect as of December 16, 1999.

Nothing in this Section shall prevent PAWC from applying its rules and regulations regarding conditions of service after Closing.

(b) ***Municipal Service Credit.*** PAWC shall provide the City a one-time Ten Thousand Dollar ($10,000) credit for future water service.

*The City shall not, at any time, be required to pay charges for public fire hydrants.*

Agreement, Art. 3, Section 3.4 (emphasis added). R.R. 65a. Pennsylvania–American's approved tariff includes a charge for "public fire hydrants,"[4] from which the "City," Coatesville, is excused. Indeed, it is excused from any future revision to the present charge.

the authority, in its review of a utility acquisition pursuant to 66 Pa.C.S. § 1102(a)(3) to determine what is in the public interest. Intervenor Coatesville Brief at 35. It maintains that this discretion is sufficient to authorize approval of the Free Service Covenant.

4. The tariff is attached to Suburban Water's Brief as Exhibit E. *See also* R.R. 188a.

We consider the Free Service Covenant against the language of Section 1303 of the Public Utility Code, which states in relevant part as follows:

*No public utility shall,* directly or indirectly, by any device whatsoever, or in anywise, *demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto.* The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part. Any public utility, having more than one rate applicable to service rendered to a patron, shall, after notice of service conditions, compute bills under the rate most advantageous to the patron.

66 Pa.C.S. § 1303 (emphasis added). This provision has been interpreted to mean that public utility tariffs have the force and effect of law, and are binding on the customer as well as the utility. *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission,* 663 A.2d 281, 284 (Pa. Cmwlth.1995).

Under the Free Service Covenant, Pennsylvania–American (a "public utility") "will receive" from Coatesville (a "municipal corporation"), a "less rate" for its fire hydrant "service" than that "specified in the tariffs of such public utility . . . ." 66 Pa.C.S. § 1303. There is no possible way to construe the Free Service Covenant around this mandate; the covenant violates Section 1303 of the Public Utility Code. *Id.*

Free public utility service has been examined by our appellate courts and found to be anathema to a system of regulation and publication of a utility's tariffs. In

*American Aniline Products, Inc. v. City of Lock Haven,* 288 Pa. 420, 425, 135 A. 726, 727 (1927), our Supreme Court determined that a city's agreement to provide free water service in order to induce an industry to locate within its boundaries "is discrimination against other users and void against public policy," reasoning that "[t]he discriminatory engagements of both [the municipal utility and the customer] are prohibited as matters of public policy for reasons so frequently stated we need not repeat them here." In *Wayne Sewerage Co. v. Fronefield,* 76 Pa. Superior Ct. 491 (1921), certain landowners claimed the right to discharge their sewage into the utility's system free of charge because of easements granted to the utility by the landowners or their predecessors. The Superior Court held that landowners had to pay the utility's scheduled rates because "[f]ree use of public service by certain favored persons cannot be permitted under any form, whether deed, contract, ordinance, agreement, or otherwise." *Id.* at 499. In *Scranton Electric Co. v. School District of Borough of Avoca,* 155 Pa.Super. 270, 37 A.2d 725 (1944), a borough ordinance granted a utility the right to use the borough's streets in exchange for free electrical service to the borough and the schools. The Superior Court found that regardless of the source of the alleged rights, which the school district claimed was an oral, "tripartite contract," the grant of free service was unlawful. Finally, in *Henshaw v. Fayette Gas Co.,* 105 Pa.Super. 564, 161 A. 896 (1932), the Superior Court rejected a contractual arrangement by which a utility had agreed to provide free utility service in exchange for a right-of-way. The Court held that the purpose of the Public Service Company Law [5] was

---

**5.** The Public Service Company Law was the predecessor of the Public Utility Code. *See* *infra* note 8 for the history of Pennsylvania's public utility statutory enactments.

to place utility customers on an equal footing.

▆▆▆ Coatesville argues that as a municipality, it should be free to accept payment for its water system [6] in the form of free hydrant service. This claim is defeated by the above-discussed precedent. The fact that it is a municipality that asserts a contract right to free utility service, as opposed to a private individual or enterprise, does not authorize a tariff deviation. *Scranton Electric Co.*, 37 A.2d at 727. Further, the fact that the tariff deviation is claimed to be a payment for an asset, such as in this case, or for the grant of an easement, does not sanction the deviation. *Henshaw,* 161 A. at 898.

In light of the language of Section 1303 and the case law on the point of free utility service, the objections of the OCA and the OTS to the Free Service Covenant were firmly grounded. However, these objections were withdrawn in a stipulation of settlement [7] (Stipulation) by which Pennsylvania–American, the City of Coatesville and the Authority agreed to amend Section 3.4(b) of the Agreement. The Amendment provides as follows:

> **NOW THEREFORE,** CCA and PAWC agree to amend Section 3.4(b) of the Agreement as follows:
>
> (b) *Municipal Service Credit and Contribution.*
>
> PAWC shall provide the City a one-time Ten Thousand Dollar ($10,000) credit for future water service.

Upon the effective date of the new tariff rates for public fire hydrant service applicable to the City, PAWC shall issue bills to the City for public fire hydrant service and collect amounts owed in accordance with PAWC's effective tariff. The City shall pay those charges for public fire hydrant service. In each year that the City makes payments for public fire service, PAWC shall make a contribution equal in amount to the public fire service payments during that year, to the City's Economic Development Fund. PAWC agrees not to seek recovery of the contributions to the City's Economic Development Fund in any future base rate case.

All other terms and provisions of the Agreement shall continue in full force and effect.

R.R. 197a. The PUC's approval of the Stipulation and Amendment included the following proviso:

> 4. That Pennsylvania–American Water Company shall file an annual tracking report with the Commission which details the accounting treatment of its annual payments to the City of Coatesville Economic Development Fund.

Opinion and Order of February 8, 2001 at 28.

▆▆▆ The question for this Court is whether the Stipulation, the heart of which is the Amendment to the Agreement, and the tracking report ordered by the PUC, taken together, overcome the deficiency in

---

**6.** It is true that the PUC's authority to interfere in the internal management of a utility is limited. *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission,* 62 Pa. Cmwlth. 460, 437 A.2d 76 (1981). Here, however, the issue is not one of utility management but of rates, over which the PUC has ongoing regulatory authority and responsibility.

**7.** The settlement was dated October 10, 2000, and it included the Office of Small Business Advocate as well as OCA, OTS, PAWC, City of Coatesville, and the Authority. R.R. 189a–195a.

the Free Service Covenant. For the reasons that follow, we find that these revisions fail to transform Section 3.4(b) of the Agreement into a lawful provision.

We return to the language of Section 1303 of the Public Utility Code, which prohibits a public utility from straying from its approved tariff "directly or *indirectly, by any device whatsoever, or in anywise* . . . . " 66 Pa.C.S. § 1303 (emphasis added). Coatesville will pay the public utility for fire hydrant service and then the public utility, Pennsylvania–American, will pay, dollar for dollar, an equal amount into the Coatesville Economic Development Fund.[8] This is free service. Using shareholder funds to make the "contribution," establishing a tracking mechanism and

separating these contributions from Pennsylvania–American's rate base do not provide a safe harbor from Section 1303's mandate. They merely do indirectly what the Free Service Covenant does directly: effect a tariff deviation.

The Pennsylvania General Assembly did not invent the language of Section 1303. The Public Utility Code has gone through several iterations, and each version has been interpreted to require strict adherence to tariffs.[9] The precise language of Section 1303 appeared first in the 1937 version of Pennsylvania's public utility law and, in turn, can be traced to Section 2 of the Federal Act to Regulate Commerce of 1887, chap. 104, 24 Stat. 379 (1887) (Act of 1887).[10] Section 2 provided as follows:

**8.** Section 1303 commands that we look at the result of an arrangement to determine whether the tariff is honored. Here, Coatesville is relieved of the burden of funding its economic development fund to the same extent it pays Pennsylvania–America for fire hydrant service. This "device" results in a tariff deviation.

**9.** The first attempt at utility regulation in Pennsylvania was The Public Service Company Law, Act of July 26, 1913, P.L. 1374, repealed and replaced by the Public Utility Law, Act of May 28, 1937, P.L. 1053. Article II, § 1 of the Public Service Company Law required utilities to adhere to tariffs that were filed with and approved by the Public Service Commission in terms more general than Section 1303 of the Public Utility Code but specific enough to be construed to forbid free service. *See, e.g., American Aniline Products, Inc.,* 288 Pa. at 423, 135 A. at 727. The next enactment was The Public Utility Law, Act of May 28, 1937 P.L. 1053, *formerly* 66 P.S. § 1101, *et seq.,* repealed and replaced by codification, Act of July 1, 1978, P.L. 598. Section 1303 of the Public Utility Code, 66 Pa. C.S. § 1303, is virtually identical to Section 303 of the Public Utility Law, *formerly* 66 P.S. § 1143.

**10.** The Act of 1887 attacks three kinds of discrimination: "personal" discrimination or favoritism in Section 2; "undue" or "unreasonable" preferences in Section 3; and treat-

ing passengers or customers in "substantially similar circumstances" differently, *i.e.,* the long-and-short-haul clause in Section 4. Section 1, which regulated rate levels, was intended to prevent extortionate rates. HILLMAN, JORDAN, COMPETITION AND RAILROAD PRICE DISCRIMINATION, at 30–43 (1968). *See also* LOCKLIN, D. PHILIP, ECONOMICS OF TRANSPORTATION, at 206–211 (1960).

It was the challenge of regulating rate differentials between long-haul and short-haul shipping that generated the political controversy and delay in the enactment of the Act of 1887. Adoption of Section 2, which addressed the problem of secret, devious or other departures from published rates, was the least controversial aspect of the legislation because it was widely recognized as the least defensible form of discrimination. The Cullom Committee Report of 1886 castigated what it called "personal discrimination" and observed that "individual favoritism is the greatest evil chargeable . . . [to] the transportation system." S.REP No. 46, at 188–191. The report used the very term "devices" to describe the machinations devised to evade scheduled rates.

Independent oil producers in Pennsylvania led the fight in Congress; it was their view that favoritism in railroad rates allowed Standard Oil to establish its market dominance. KOLKO, GABRIEL, RAILROADS AND REGULATION 1877–1916 at 22 (1965). The congressional

That if any common carrier subject to the provisions of this act shall, *directly or indirectly, by* any special rate, rebate, drawback, or *other device, charge*, demand, collect, *or receive* from any person or persons a *greater or less compensation for any service rendered*, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty

of unjust discrimination, which is hereby prohibited and declared to be unlawful. 24 Stat. 379 (1887)(emphasis added). Although renamed and amended multiple times, the essential provisions of the Act of 1887, including the requirement that carriers adhere to published tariffs, have been retained and remain effective. Rene Sacasas, *The Filed Rate Doctrine: Casualty or Survivor of Deregulation?* 29 Duq. L.Rev. 1, 6 (1990).

Courts have applied Section 2 of the Act of 1887 strictly.[11] In *New York, New Haven & Hartford Railroad Co. v. Interstate Commerce Commission*, 200 U.S. 361, 391, 26 S.Ct. 272, 50 L.Ed. 515 (1906), one of the early Section 2 decisions,[12] the U.S.

debate was finally brought to a head by the U.S. Supreme Court, which decided in 1886 that states could not exercise control over rates charged by railroads for interstate commerce. *Wabash, St. Louis & Pacific Railway Co. v. Illinois*, 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886). Because the vast majority of railroad traffic was interstate, it left a void in regulation. Congress acted quickly to enact the Act of 1887.

11. One of the first cases to consider Section 2 of the Act of 1887 was *Wight v. U.S.*, 167 U.S. 512, 17 S.Ct. 822, 42 L.Ed. 258 (1897). To move beer from Cincinnati to his warehouse in Pittsburgh, a wholesaler paid a carrier, known as the Panhandle Railroad, fifteen cents per hundred pounds. The Panhandle Railroad had a siding next to the wholesaler's warehouse, where the beer was unloaded directly.

The Baltimore & Ohio, which had its siding across town, offered to ship the beer to the wholesaler's warehouse from Cincinnati for the same charge; it intended to accomplish this by paying for local hauling to the warehouse. After discussion, the wholesaler agreed to haul his own beer for three and one-half cents per hundred pounds. Accordingly, the wholesaler paid the Baltimore & Ohio fifteen cents for moving his beer from Cincinnati to Pittsburgh, and then received three and one-half cents from the Baltimore & Ohio for delivering his own beer to his warehouse. The Court observed as follows:
 It is true, he formally paid 15 cents, but he received a rebate of 3 1/2 cents; and *regard*

*must always be had to the substance, and not to the form*. Indeed, the section itself forbids the carrier, *"directly or indirectly by any special rate, rebate, drawback or other device,"* to charge, demand, collect, or receive from any person or persons a greater or less compensation, etc. And section 6 of the act ... throws light upon the intent of the statute; for it requires the common carrier, in publishing schedules, to "state separately the te"
*Id.* at 517–518, 17 S.Ct. 822 (emphasis added).

The *Wight* holding has application here. Coatesville will pay the hydrant service charge, but it will receive a rebate in the form of a "contribution" to the Coatesville Economic Development Fund. It is an arrangement that violates the scheduled tariff of Pennsylvania–American. The argument to the contrary exalts form over substance, as noted by the ALJ in his Initial Decision. The U.S. Supreme Court reasoned in *Wight* that, "regard must always be had to the substance, and not to the form." *Id.* at 517–518, 17 S.Ct. 822.

12. In its 1906 decision, the U.S. Supreme Court expressed surprise at the lack of precedent on Section 2, considering that it had been the law of the land since 1887. *New York, New Haven & Hartford Railroad Co.*, 200 U.S. at 391, 26 S.Ct. 272. It noted that

 questions concerning the import of the act have been often here, such questions have

Supreme Court declared that one "great purpose of the act to regulate commerce was to prohibit such secret departures from such [regulated] rates." Judicial intolerance for deviation from regulated rates has continued unabated. In describing the filed tariff doctrine, the U.S. Supreme Court wrote:

> [T]he rate of the carrier duly filed is the only lawful charge. *Deviation from it is not permitted upon any pretext.* Shippers and travelers are charged with notice, of it, and they as well as the carrier must abide by it.... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. *The rule is undeniably strict, and it obviously may work hardship in some cases,* but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Louisville & Nashville Railroad Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915) (emphasis added). Accordingly, the U.S. Supreme Court held that a passenger who was misquoted the price of a railroad ticket by the ticket agent could be compelled to pay the higher tariff rate filed by the railroad. The reason for the strict rule has been recently explained by the Supreme Court:

While the filed rate doctrine may seem harsh in some circumstances, its strict application is necessary to "prevent carriers from intentionally 'misquoting' rates to shippers as a means of offering them rebates or discounts," the very evil the filing requirement seeks to prevent. Regardless of the carrier's—motive whether it seeks to benefit or harm a particular customer—the policy of non-discriminatory rates is violated when similarly situated customers pay different rates for the same services.

*American Telephone & Telegraph Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 223, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (citations omitted).

Intolerance for utility tariff deviation has been expressed with equal force by Pennsylvania's appellate courts and on numerous occasions. In *Leiper v. Baltimore & Philadelphia Railroad Co.,* 262 Pa. 328, 105 A. 551 (1918), our Supreme Court acknowledged the debt owed by the Pennsylvania General Assembly to Congress for Pennsylvania's scheme of utility regulation.[13] Indeed, the Court stated that the U.S. Supreme Court's description of the Act of 1887 as securing equality of rates by destroying favoritism, rebates and preferences "applies with equal force to the language of the act of 1913." *Leiper,* 262 Pa.

not generally involved the operation and effect of the act concerning the command that published rates be adhered to, and the prohibitions, against discrimination, favoritism, or rebates, but have mainly concerned the meaning of the act in other respects....
*Id.* The Court found a contract whereby the Chesapeake & Ohio sold coal, as a dealer, at a price too low to transport its own coal at its published rate a violation of Section 2; the railroad could not do "indirectly" what it could not do "directly."
As with Section 2 of the Act of 1887, there is a paucity of case law on Section 1303's

prohibition against tariff deviation. The explanation may lie in the clarity of the statutory command. As observed by our Supreme Court, the "principles governing a case of this nature are too well settled to require discussion." *Borough of Dormont v. South Pittsburgh Water Co.,* 322 Pa. 60, 62, 185 A. 263 (1936).

13. The debt grew larger in 1937 when the General Assembly enacted Section 303 of the Public Utility Law, *formerly* 66 P.S. § 1143, which is almost word-for-word identical to Section 2 of the Act of 1887.

at 332, 105 A. at 553.[14] Thus, in *Leiper,* our Supreme Court held that a contract that fixes a utility's rates for an "indeterminate period will not be sustained" because it would excuse the customer from tariff revisions that may take place over that period of time. *Leiper,* 262 Pa. at 335–336, 105 A. at 554.

Pennsylvania appellate courts have held firmly to the principles *Leiper* established. In *Borough of Dormont v. South Pittsburgh Water Co.,* 322 Pa. 60, 62, 185 A. 263, 264 (1936) in a *per curiam* opinion, our Supreme Court refused to allow a municipality to assert its contract right to fixed hydrant service rates for 20 years, in avoidance of intervening rate increases, even though the 1912 contract providing for those rates preceded the enactment of the Public Service Company Law in 1913. The excuse of mistake or misquote does not suffice to avoid a tariff. Accordingly, in *West Penn Power Co. v. Nationwide Mutual Insurance Co.,* 209 Pa.Super. 509, 228 A.2d 218 (1967), Nationwide, which had been erroneously underbilled for electrical service, was required to make up the difference. The form of agreement is of no moment in attempting to bypass a scheduled tariff. In *Bell Telephone Co. v. Pennsylvania Public Utility Commission,* 53 Pa.Cmwlth. 241, 417 A.2d 827, 829 (1980), this Court reinforced *West Penn Power,* noting that "the nature or form of the contract could not affect the Commission's power to change its terms by imposing new rates."

The object of the General Assembly in choosing language almost identical to Section 2 of the Act of 1887 is clear: it sought to prevent "secret departures" from a scheduled tariff. The language "indirectly, by any device, or in anywise" must be given effect. It is the very complexity[15] of the Amendment and the Stipulation that mark the arrangement as an unlawful "device."[16] The Amendment will in "anywise" do "indirectly"[17] what the

14. *A fortiori,* under *Leiper,* federal case law interpreting Section 2 has even greater applicability to the interpretation of Section 303 of the Public Utility Law, *formerly* 66 P.S. § 1143, now codified at Section 1303, 66 Pa. C.S. § 1303, inasmuch as its language is derived from Section 2 of the Act of 1887.

15. Pennsylvania–American and the PUC make much of the "shareholder funds" aspect of the arrangement. The hat is not being passed at the annual meeting of shareholders. There is no escaping the fact that funds of the utility, Pennsylvania–American, regardless of their accounting treatment, will be used to make the contractually obligated payments to the Coatesville Economic Development Fund. The shareholder(s) of Pennsylvania–American cannot buy and sell the assets of Pennsylvania–American. Shareholder funds are created out of the rates paid by Pennsylvania–American's customers. To the extent Coatesville does not pay these rates, it does not contribute to the company's profits, thereby burdening other customers to generate profits. In any case, Section 1303 binds the corporation, Pennsylvania–American, and it does not provide an exception for "shareholder funds" of that corporation.

16. It is also a "secret departure" from Pennsylvania–American's tariff. Of course, in light of this litigation, it is not a well-kept secret. Publication of a utility's tariffs is an essential part of the Public Utility Code's "great purpose." The arrangement we consider herein is a matter of public record, but it is not part of Pennsylvania–American's published tariffs. In that sense, as a violation of the publication requirement, it is a secret device.

17. The word "indirectly" has been considered by various appellate courts construing state and federal laws. As noted by the Nebraska Supreme Court

"Indirectly" signifies the doing by an obscure circuitous method something which is prohibited from being done directly, and includes all methods of doing the things prohibited except the direct one. *Farmers' State Bank v. Mincher* (Tex.Civ.App.) 267 S.W. 996.

*State v. Pielsticker,* 118 Neb. 419, 225 N.W. 51, 52 (1929). In *Amicable Life Insurance Co.*

Free Service Covenant cannot do directly, *i.e.*, effect a departure from Pennsylvania–American's scheduled tariff.

■ Pennsylvania–American and the PUC argue that the PUC has the authority to allow tariff deviation where it is in the public interest. Administrative agencies do not have the authority to order a regulated company to change lawful conduct on the theory that it is in the best interest of their customers. *Aetna Casualty and Surety Insurance Co. v. Insurance Department*, 536 Pa. 105, 638 A.2d 194 (1994). The corollary is equally true; an agency cannot waive a mandate of statute because it is in the public interest. In *Pennsylvania Electric Co.*, 663 A.2d at 284–285, we specifically held that the PUC lacks the authority to waive a tariff eligibility requirement for the stated reason that it would advance the "public interest." Indeed, a statutory command defines the public interest,[18] and an administrative agency established to enforce that statutory command simply lacks the authority to issue countermand orders. It is for the General Assembly, and not for utilities, their customers or even the PUC, to decide whether free fire hydrant service is appropriate in circumstances such as these.

The PUC, in its adjudication, defended its approval of the Amendment by stating

that it could only accept the ALJ's reasoning were it to find the arrangement "unlawful *per se*." [19] The financial strength of Pennsylvania–American's shareholder, American Water Works Company, Inc., a publicly-traded company with capitalization of $4.1 billion, led the PUC to conclude that Pennsylvania–American could bear the obligation to make eternal donations to the Coatesville Economic Development Fund. On appeal, the PUC offers only a conclusory argument to support its adjudication: "the contribution by PAWC's sole shareholder and parent company, American Water Works Company, Inc., to the City's Economic Development Fund, is not violative of the Public Utility Code." Respondent Brief at 14. The PUC does not parse or explain Section 1303 of the Public Utility Code or even cite to it in its brief.

First, it is Pennsylvania–American, not its shareholder, that has the contractual obligation to make payments to the Coatesville Economic Development Fund. American Water is not a party to the Agreement. If the payments are not made, Coatesville can seek contract remedies only from Pennsylvania–American.

Second, the funds used to make the "contributions" are those of Pennsylvania–

---

*v. O'Reilly*, 97 S.W.2d 246, 249 (Tex.Civ.App. 1936), the Texas Supreme Court noted that "indirectly" cannot be treated as surplusage; this word must be given its meaning in the adjudicated case. Here, Pennsylvania–American seeks to do by an obscure circuitous method, *i.e.*, the Amendment, that which it cannot do directly, *i.e.*, the Free Service Covenant.

**18.** In *Pennsylvania Public Utility Commission v. Israel*, 356 Pa. 400, 52 A.2d 317 (1947), a gypsy cab driver defended against the PUC's action to enjoin his unlicensed activities by arguing that he was performing a public service inasmuch as there was a shortage of

taxicabs in Philadelphia. Our Supreme Court rejected this argument stating:

> The argument that a violation of law can be a benefit to the public is without merit. When the Legislature declares certain conduct to be unlawful it is tantamount in law to calling it injurious to the public. For one to continue such unlawful conduct constitutes irreparable injury.

*Israel*, 356 Pa. at 406, 52 A.2d at 321.

**19.** However, we believe the arrangement to be unlawful *per se;* the PUC argues from a premise we do not accept.

American, not its parent.[20] "Shareholder funds" appears to be an accounting term used to designate Pennsylvania–American funds available for shareholder return; it does not literally mean American Water will write the checks. However, even if American Water did write the checks and did become a party to the arrangement by contract, it would not cure the Section 1303 violation. As we have held, public utility tariffs bind the customer as well as the utility. *Pennsylvania Electric Co.*, 663 A.2d at 284. Adding American Water to the contract would make the device more complex but not lawful. In *Scranton Electric Co.*, 37 A.2d at 727, the Superior Court held that regardless of the rationale, a "tripartite contract" did not justify a tariff deviation.

Third, the financial might of American Water is nearly meaningless. The events of this year have shown that public companies have feet of clay, but more importantly, American Water is free to sell Pennsylvania–American for any reason or no reason. There is no basis for the PUC's confidence that American Water will be around—in perpetuity[21]—to support Pennsylvania–American's obligation to contribute to the Coatesville Economic Development Fund.

Pennsylvania–American contends that if we do not affirm the PUC, we sound the death knell for charitable donations by utilities. It argues from a false premise. Pennsylvania–American's payments to the Coatesville Economic Development Fund are not donations but, rather, contractual obligations. We sound the death knell only for pretextual "donations"[22] that are, in actuality, rebates.[23]

We are not unmindful of or unsympathetic to the economic plight of Coatesville. As a matter of course, it needed to consider the cost of future fire hydrant service, which was free so long as it owned the water system, when it developed its sales price. The transaction could have been structured to accomplish Coatesville's budgetary needs in a way that complied with the Public Utility Code. For example, part of the sale proceeds could have been placed in a segregated account established to generate income sufficient to cover the expected future cost of fire hydrant service. Alternatively, the parties could have agreed that Pennsylvania–American would pay part of the sales price in install-

---

**20.** This point is acknowledged by Coatesville. See Intervenor Coatesville Brief at 37.

**21.** Apart from the fact that entailing Pennsylvania–American's assets in perpetuity may violate the Rule Against Perpetuities, the free hydrant service arrangement, to be tracked by the PUC "in perpetuity," is breath-taking in scope, even assuming the parties do not mean the language to be taken literally. Engineering works have the tendency to outlast our legal inventions. The City of Rome continues to be served by aqueducts and sewers that are over 2,000 years old, during which period the City has seen numerous, quite different, forms of government, including anarchy. The PUC, while well-intentioned, cannot be expected to carry out its commitment of eternal vigilance by the "tracking report"; after all, the agency the PUC was modeled on, the Interstate Commerce Commission, no longer exists. 109 Stat. 803 (1995).

**22.** In *Israel*, 356 Pa. at 402–409, 52 A.2d at 319–322, the gypsy cab operator claimed that he was not being compensated by a charge but, rather, a "donation." Our Supreme Court rejected this characterization. It is the function of a payment, not its tagline, that is determinative.

**23.** Accordingly, a utility customer could not, for example, contract with a utility to have the utility make donations to the customer's favorite charity calculated as a percentage of the customer's charge. Such an agreement would establish a rebate even though the recipient is not the same person paying the charge in the scheduled tariff.

ments[24] for some period of time that would ease Coatesville's transition to having to budget for fire hydrant service. The key difference between these suggested alternatives and the arrangement between Pennsylvania–American and Coatesville is a fixed sales price. Here, the Amendment makes the purchase price an imprecise number and places all risk of the cost of future hydrant service on the utility, Pennsylvania–American.

Section 3.4(b) of the Agreement, in both its original and amended form, violates Section 1303 of the Public Utility Code.[25] To hold otherwise, would mark an extreme departure from the plain language of the statute and unequivocal precedent. We decline the invitation to do so.

### SECTION 1304 OF THE PUBLIC UTILITY CODE

 Suburban Water challenges the PUC's approval of the Amendment on the additional theory that the Amendment violates the statutory prohibition against a utility giving an "unreasonable preference" to one customer while subjecting another to an "unreasonable disadvantage." Pennsylvania–American notes, correctly, that it is Suburban Water's burden to show the arrangement "unreasonably preferential." It further argues that before a preference can be found unreasonable, the advantage to one service class must be balanced against the injury to another and the injury found to outweigh the benefit. Under any analytical approach, Section 3.4(b) of

the Agreement gives an unreasonable preference to Coatesville. It cannot be justified by or even related to Pennsylvania–American's costs to deliver fire hydrant service to Coatesville.

Section 1304 of the Public Utility Code provides, in relevant part, as follows:

> No public utility shall, as to rates, make or grant any *unreasonable preference or advantage* to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

\* \* \*

> No rate charged by a municipality for any public utility service rendered or furnished beyond its corporate limits shall be considered unjustly discriminatory solely by reason of the fact that a different rate is charged for a similar service within its corporate limits.

66 Pa.C.S. § 1304 (emphasis added).[26] Again, the General Assembly drew upon the Act of 1887, specifically Section 3, which stated:

> That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or *unreasonable preference or advantage* to any particular person, company, firm,

---

24. However, there is no way that the installments could continue, as here, "in perpetuity." Unless fixed for a finite period of time, the payments would lose their character as installments on a purchase and acquire, instead, the character of a rebate. In *Leiper,* our Supreme Court held that a contract that purports to fix rates for an "indeterminate period" cannot stand. *Leiper,* 262 Pa. at 335, 105 A. at 554.

25. It is not necessary to address Suburban Water's alternate argument that the PUC abused its discretion by approving the amendment. The PUC erred as a matter of law in approving the Amendment.

26. This language is identical to Section 304 of the Public Utility Law enacted in 1937, *formerly* 66 P.S. § 1144.

corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

24 Stat. 379 (1887).[27] Section 3 of the Act of 1887 was intended to recognize differences in classes of service; Congress did not seek to establish a system of "equal mileage rates." Stated otherwise, the Act of 1887 did not seek to end discrimination in any form, but it did seek to regulate the "relative differences between local and through rates upon a just and equitable basis." Cullom Committee Report of 1886, S. Rep No. 46, at 176.

One of the first cases to consider the meaning of "undue or unreasonable preference" in Section 3 of the Act of 1887 was *Interstate Commerce Commission v. Baltimore & Ohio Railroad Co.*, 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699 (1892). The Commission, upon complaint of a competitor railroad, ordered the Baltimore & Ohio to terminate the sale of "party rate" tickets, which allowed a group of ten or more persons to travel on a single ticket at a lower price than if ten individual tickets were purchased. The Commission held that the discount was an unreasonable preference, and the U.S. Supreme Court reversed. The Court did an exhaustive review of the longstanding practice of giving reduced rates for increased mileage, which was recognized to be a valid form of competition between railroads. It also considered discounts for "frequent" travelers, the 1,000–mile ticket and other means by which railroads sought to increase their

traffic. The Court concluded that as long as an increase in business more than made up for the *per capita* reduction in charge, the reduction was reasonable and in the interests of both the carrier and the public. Further, as long as one party of ten was treated the same as another party of ten, there was no "undue preference." *Baltimore & Ohio,* 145 U.S. at 284, 12 S.Ct. 844.

Suburban Water contends that the Free Service Covenant and the Amendment establish an unreasonable preference for Coatesville, which, alone among Pennsylvania–American's municipal customers, will receive hydrant service for effectively no charge. In response, Pennsylvania–American argues that consideration of what is "reasonable" depends on the facts and circumstances of each case, and that this Court should in any case, defer to the exercise of the PUC's discretion in evaluating whether a rate differential is unreasonable.

Our appellate courts have followed the approach of the U.S. Supreme Court in *Baltimore & Ohio*. Mere variation in rates among classes of customers does not *per se* create an intolerable preference. *Building Owners and Managers Association v. Pennsylvania Public Utility Commission,* 79 Pa.Cmwlth. 598, 470 A.2d 1092 (1984). Different rates may be charged to customers that receive a different type, grade or class of service. *Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa.Super. 447, 15 A.2d 473 (1940). However, if the total sum demanded of one customer is illegally high and illegally low for another, there is rate discrimination. *Allegheny Ludlum Corp. v. Pennsylvania Public Utility Commission,* 149 Pa. Cmwlth. 106, 612 A.2d 604 (1992). Rate

**27.** In turn, Congress drew upon the English Traffic Act of 1854 for Section 3 inspiration. *Interstate Commerce Commission v. Baltimore & Ohio Railroad Co.*, 145 U.S. 263, 282, 12

S.Ct. 844, 36 L.Ed. 699 (1892). *See also* Cullom Committee Report of 1886, Cong. Rec. 3472 (1886); Hillman, *see supra* note 10, at 31, 42.

classification systems must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers. *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission,* 3 Pa.Cmwlth. 184, 281 A.2d 179 (1971).

■ It is true that rate-making questions require the exercise of the PUC's expertise, and we tend to defer to the PUC's exercise of discretion in this area. *Sharon Steel Corp. v. Pennsylvania Public Utility Commission,* 78 Pa.Cmwlth. 447, 468 A.2d 860 (1983) (wherein we affirmed a classification system that used risk and graduation criteria). However, this Court reviews the PUC's exercise of discretion and will reverse where appropriate. In *Barasch v. Pennsylvania Public Utility Commission,* 111 Pa.Cmwlth. 339, 533 A.2d 1108 (1987), for example, we refused to allow a rate classification that would impose a surcharge to customers living outside Emmaus to fund improvements to telephone service within Emmaus, which was receiving sub-standard service. We found that it would be unreasonable to make non-Emmaus customers bear the burden of the utility's inadequate service to Emmaus customers.

■ In sum, in order for a rate differential to survive a challenge brought under Section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304, the utility must show that the differential can be justified by the difference in costs required to deliver service to each class. The rate cannot be illegally high for one class and illegally low

for another. *Allegheny Ludlum Corp.,* 612 A.2d at 611. Overall, the rate differentials must advance efficient and satisfactory service to the greatest number at the lowest overall charge.

■ Pennsylvania–American's tariff does not express a rate preference for Coatesville. It does not state, for example, that municipalities with nothing to sell must pay a higher rate for fire hydrant service than municipalities blessed with an asset sold to Pennsylvania–American. It is not that the Amendment satisfies Section 1304 of the Public Utility Code; it is that Section 1304 has no application to this situation.

Section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304, establishes standards that must be followed when a utility is making a rate. Section 1304 must be read in conjunction with other provisions of the Public Utility Code, such as Section 1302,[28] which requires, *inter alia,* that "tariffs showing rates" be filed with the PUC and be made available for public inspection. Necessarily, the rate-making activity referred to in Section 1304 is the making of rates that end up in a scheduled tariff, *i.e.,* the only lawful way to make rates. The provisions of Section 1303 and 1304 are complementary, but they do not overlap. A charge that deviates from the scheduled tariff is unlawful even if it satisfies the standards set forth in Section 1304. It is not a defense to a Section 1303 violation to argue that the charge meets the rate-making standards of Section 1304. If a charge

---

**28.** It states in relevant part:

[E]very public utility shall file with the commission, within such time and in such form as the commission may designate, tariffs showing all rates established by it and collected or enforced, or to be collected or enforced, within the jurisdiction of the commission.... Every public utility shall keep copies of such tariffs open to public inspec-

tion under such rules and regulations as the commission may prescribe. One copy of any rate filing shall be made available, at a convenient location and for a reasonable length of time within each of the utilities' service areas, for inspection and study by customers, upon request to the utility.

66 Pa.C.S. § 1302.

deviates from the scheduled tariff, that is the basis of its unlawfulness. There is no need to go further and determine whether the unlawful rate meets the standards for a lawful rate;[29] it is a futile exercise.

■■■ This is a deviation case, not a case where the tariff[30] itself provides an undue preference for class at the expense of another. The Amendment, not Pennsylvania–American's tariff, established a rate differential based upon the personal identity of the customer, which is indefensible discrimination. *See, e.g., Wight,* 167 U.S. at 517–518, 17 S.Ct. 822; *Leiper,* 262 Pa. at 336, 105 A. at 554. Although Pennsylvania–American's tariff does not violate Section 1304 of the Public Utility Code, it is also clear that Pennsylvania–American cannot solve its tariff deviation problem simply by revising its tariff to provide Coatesville free service. Pennsylvania–American cannot justify providing hydrant service to Coatesville at no charge; there must be a difference in the type and condition of the respective service in order for a rate differential to satisfy the terms of Section 1304. *Carpenter,* 15 A.2d at 476. Free service is necessarily an illegally low charge. *Allegheny Ludlum Corp.,* 612 A.2d at 604.

## JUDICIAL ESTOPPEL

The PUC argues that Suburban Water should be barred from bringing a challenge to free utility service because of its agreement with Chalfont, which requires a temporary freeze of Chalfont's rates for existing hydrant service. Suburban Water's acquisition of Chalfont was approved in a proceeding before the PUC subsequent to the instant proceeding. Thus, the PUC contends that it would violate the doctrine of judicial estoppel to permit Suburban Water to challenge free utility service in this proceeding. We disagree.

■■■ As a general proposition, a litigant is estopped from assuming a position inconsistent with his position in a previous action, if the litigant was successful in that contention. *Associated Hospital Service v. Pustilnik,* 497 Pa. 221, 227, 439 A.2d 1149, 1151 (1981). To be successful, the court in the prior proceeding must have been persuaded to accept the litigant's position; in other words, the position must be litigated to conclusion. It will not be applied where the other proceeding has terminated in a settlement. *Id.* The purpose of the doctrine is to uphold the integrity of the courts by preventing litigants from changing positions as the moment requires. *Trowbridge v. Scranton Artificial Limb Co.,* 560 Pa. 640, 645, 747 A.2d 862, 865 (2000); *Koschak v. Redevelopment Authority of Wilkes–Barre,* 758 A.2d 291, 293 (Pa.Cmwlth.2000). However, for the doctrine to apply, the issues and the parties have to be the same, and the inconsistent positions must be asserted in the same or subsequent phase of the same proceeding or in a subsequent proceeding involving the same parties. *Little v. State Employes' Retirement Board,* 760 A.2d 488, 491 (Pa.Cmwlth.2000).

29. The corollary is also true. A rate that deviates from the published tariff is not "more unlawful" because it also does *not* meet the standards of a lawful rate, and therefore, could not be approved by the PUC.

30. We reject Pennsylvania–American's contention that the PUC's approval of the amendment made the contract part of, and an exception to, the tariff. The argument would mean that the PUC could dispense tariff deviation rights at will. It would also expand the authority of the PUC, when approving an acquisition under 66 Pa.C.S. § 1102, to grant dispensation from any mandate in the Public Utility Code. The proffered interpretation is absurd and rejected for reasons already articulated.

██ This appeal is not a subsequent phase of the *Chalfont* proceeding nor is it a subsequent proceeding involving the same parties. The Coatesville proceeding was initiated by Pennsylvania–American's application on February 29, 2000; the PUC's adjudication on that application was appealed on March 15, 2001. The *Chalfont* proceeding was initiated by Suburban Water's application on September 4, 2001, over 18 months *after* the Coatesville proceeding was initiated and nearly seven months *after* issuance of the PUC's order that is the subject of this appeal.

Moreover, judicial estoppel only bars a party from taking a position inconsistent with its earlier position in a *previous action if its contention was successfully maintained.* *Associated Hospital Service,* 497 Pa. at 227, 439 A.2d at 1151. Here, Suburban Water's position in the Coatesville proceeding was not successful; thus, the doctrine does not apply. Indeed, to remain competitive, Suburban Water had no choice in its business dealings with Chalfont but to follow the PUC's interpretation of Public Utility Code, unless and until it was reversed by this Court.

Because of the difference in parties [31] and the difference in the two proceedings, we find little merit in the PUC's contention [32] that Suburban Water is barred by the doctrine of judicial estoppel from challenging the PUC's approval of the Amendment. The transaction with Chalfont was developed long after Suburban Water appealed the PUC's determination. Suburban Water was not required to become

non-competitive while it prosecuted this appeal.

## CONCLUSION

In its request for proposal, Coatesville stated that the successful bidder had to make "whatever arrangements necessary *to waive or pay* these charges on behalf of the City." Pennsylvania–American honored this demand by structuring the payment of Coatesville's fire hydrant service charge as a contribution to a special fund of the City. However, the law does not permit such an arrangement for relieving Coatesville of the obligation to pay Pennsylvania–American's scheduled tariff amount for fire hydrant service. Section 3.4(b) of the Agreement establishes a device that violates Section 1303 of the Public Utility Code, 66 Pa.C.S. § 1303.

Accordingly, we reverse the PUC.

## ORDER

AND NOW, this 21st day of October, 2002 the Decision and Order of the Pennsylvania Public Utility Commission in the above-captioned proceeding is reversed with respect to approval of Section 3.4(b) of the Asset Purchase Agreement as originally proposed or as amended.

## DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority decision because this case does not involve tariff violations, but only a business decision by Pennsylvania–American Water

---

**31.** In its brief, Suburban Water notes the many differences in the facts that preclude application of the doctrine of judicial estoppel: the applications in each are different utilities; the Chalfont arrangement did not fix rates in perpetuity; the Chalfont rate freeze and phase-in was limited to existing hydrants, not new ones; and the Suburban Water tariff included the Chalfont phase-in plan.

**32.** Generating more heat than light, the PUC berates Suburban Water's appeal as nothing but the lamentations of a disapproved bidder and arch-competitor of Suburban Water. This argument confuses motive with merits; we may examine the latter, but not the former.

Company (PAWC) affecting its shareholders.

In 1998, the City of Coatesville (Coatesville) announced it was accepting bids for the acquisition of its waterworks system which had to include free fire hydrant service to Coatesville in perpetuity as a non-negotiable term. Philadelphia Suburban Water Company (Suburban Water) sought a declaratory order from the Pennsylvania Public Utility Commission (PUC) that the bid term for free hydrant service was unlawful under the Public Utility Code (Code). The PUC determined that PAWC could structure the provisions of any agreement as it saw fit, bearing in mind that the PUC had to review and approve the provisions for compliance with the Code, and that the utility had to charge rates that were consistent with its approved tariff rate. PAWC was selected as the winning bidder, the parties entered into an Agreement, and PAWC submitted an application, along with the Agreement, to the PUC for approval. Suburban Water, as well as various other parties, protested the Agreement, arguing that the free service covenant violated the Code.

Following hearings before an Administrative Law Judge (ALJ), PAWC and Coatesville amended the Agreement by deleting the free service covenant and replacing it with a new provision in which PAWC agreed to bill Coatesville for the fire hydrant service and Coatesville agreed to pay PAWC the invoiced amount. Further, PAWC agreed to make an annual contribution to the Coatesville Economic Development Fund in an amount equal to Coatesville's annual charge for fire hydrant service. PAWC agreed to use shareholder funds rather than ratepayer funds to make these contributions. The ALJ issued a decision recommending the approval of PAWC's acquisition but with the stipulation that the free service covenant and the amendment be deleted because they violated the Code as PAWC would be receiving free fire hydrant service. PAWC and Coatesville filed exceptions to the ALJ's decision. Finding that the use of shareholder funds as a below-the-line item to consummate the acquisition was not without precedent and was not improper under the Code, the PUC rejected the ALJ's recommendation and approved the amendment to the Agreement subject to the establishment of a tracking mechanism to ensure that only shareholder funds were used to make the annual payments. Suburban Water then appealed, requesting this Court to reverse the PUC's approval of the Agreement allowing for the free fire hydrant service because it violates the Code.

The majority agrees with Suburban Water and reverses the PUC, concluding that the Agreement violates Section 1303 of the Code, 66 Pa.C.S. § 1303, prohibiting a utility from charging any rates other than those specified in its tariff and Section 1304 of the Code, 66 Pa.C.S. § 1304, prohibiting against the establishment of unreasonable preferences between classes of service. I respectfully dissent because there is no violation of either of those Code sections, and ratepayers are not being harmed because they are not paying for that free hydrant service.

Although Section 1303 of the Code prohibits any person from paying a lesser rate for service than that specified in the tariff of a public utility, a tariff is not at issue here because the Agreement between PAWC and Coatesville involves an expenditure of PAWC and not a difference in the payment of any rate. The PUC was correct in concluding that PAWC's ratepayers would not be harmed if the annual payment came from shareholder profits because their contribution would not decrease the cost of service to customers, the

financial integrity of PAWC would not be placed at risk, and the tracking mechanism required would prevent any pecuniary impacts from reaching customers. As to Section 1304 of the Code, a diminution in profit does not establish the existence of unreasonable discrimination. After PAWC receives payment of the lawful tariff rate, like any private company, what it does with its own money is its own business, and it is entitled to spend its profits as it sees fit.

Accordingly, because I agree with the PUC that the Agreement as amended does not violate the Code, I would affirm the PUC's decision.

Judge SMITH–RIBNER joins in this dissenting opinion.